**MBANK NEW BRAUNFELS, N.A.**

v.

**FDIC, both in its Capacity as Receiver for MBank Dallas, N.A. and in its Corporate Capacity, and The Deposit Insurance Bridge Bank, N.A.**

Civ. A. No. 3-89-1064-F.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 29, 1989.

Thomas Luce, III, David Bryant, Hughes & Luce, Dallas, Tx., for MBank New Braunfels.

Robert F. Reklaitis, Peter Lovato, III, Hopkins, Sutter & Clark, Irving, TX., for FDIC.

MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

ROBERT W. PORTER, Chief Judge.

For purposes of the determination of Plaintiff MBank New Braunfels' (herein-

after "MBNB") Application for a Preliminary Injunction, the parties herein have stipulated to the facts below. The parties have stated on the record, at the hearing on this matter before the Court on 6/26/89, that the below stipulated facts leave no material facts at issue between the parties with regard to Plaintiff's Application for Preliminary Injunction. The Court agrees. And for the reasons set forth below, it is the Court's opinion that the Plaintiff's Application for Preliminary Injunction should be DENIED.

## I. Factual Background

### (A) *Stipulated Facts*

(1) MBNB is now, and at all times since 1/1/89 has been, a solvent banking association.

(2) MBNB is now, and at all times since 1/1/88 has been, a direct subsidiary of MCorp Financial, Inc. ("MCorp Financial"), and an indirect subsidiary of MCorp.

(3) Prior to the close of business on 3/28/89, MCorp Financial owned 25 MBanks in Texas, including MBNB and MBank Dallas.

(4) MCorp Financial was the sole owner of both MBNB and MBank Dallas prior to the close of business on 3/28/89.

(5) Between 9/30/88 and February, 1989, MBank Dallas lost almost 25% of its deposits, although its deposits were generally more stable from February, 1989 through 3/24/89. MBank Dallas' borrowing increased at the Federal Reserve Bank's Discount Borrowing Window from 9/30/88 to February 1989, but did not increase materially from February 1989 through 3/24/89.

(6) MBank Dallas was open for business on 3/27/89 and 3/28/89 during normal business hours.

(7) On 3/21/89, a petition was filed to place MCorp into involuntary bankruptcy. On 3/27/89, $46.9 million of overnight federal funds was returned by MBank Dallas to MBNB.

(8) As of 3/27/89, an additional $17.1 million of federal funds plus interest had been placed with MBank Dallas by MBNB under five separate agreements of varying amounts at varying interest rates, each with varying dates of maturity, which agreements were dated 6/13/88, 9/2/88, 1/27/89, 1/27/89, and 1/27/89, respectively.

(9) On 3/27/89 and 3/28/89, MBNB made oral demand on MBank Dallas for immediate withdrawal and repayment of the $17.1 million of federal funds held by MBank Dallas.

(10) During business hours on 3/28/89, MBNB delivered to MBank Dallas by telecopy a written demand for immediate withdrawal and repayment of such $17.1 million of federal funds held by MBank Dallas.

(11) On 3/28/89, counsel for MBank Dallas and MBank Houston wrote to the Chairman of the FDIC, William Seidman, and referred to the "deteriorating liquidity and capital situation" of those banks and stated that, without FDIC assurance to depositors and general creditors of such banks that valid and enforceable obligations of such Banks would be fully honored, MBank Dallas and MBank Houston "may soon be valueless as franchises."

(12) MBank Dallas refused to pay or to cause the repayment to MBNB of all or any part of such $17.1 million in federal funds on 3/27/89, 3/28/89, or at any time to date.

(13) After business hours on 3/28/89, the Comptroller of the Currency declared MBank Dallas insolvent and appointed FDIC/Receiver to act as Receiver for MBank Dallas.

(14) The Defendants implemented the following three agreements the night of 3/28/89:

(a) the Purchase and Assumption Agreement between the FDIC/Receiver of MBank Dallas and the Bridge Bank;

(b) the Contract of Sale between FDIC/Receiver of MBank Dallas and the FDIC/Corporate; and

(c) the Indemnity Agreement between FDIC/Corporate and the Bridge Bank.

(15) The current expectation of FDIC/Corporate and FDIC/Receiver is that MBNB will ultimately recover from

the MBank Dallas receivership estate its pro rata share of the assets of MBank Dallas as of bank closing on 3/28/89 or 3/29/89, which is estimated to be no more than 80% of $17.1 million.

(16) Neither MCorp nor MCorp Financial has injected any funds into MBNB since 3/21/89.

(17) MBNB has not formally requested financial assistance from MCorp or MCorp Financial since 3/21/89.

(18) The parties have stipulated and agreed that the following documents are admissible:

(a) all documents marked as exhibits to the depositions taken in this action;

(b) the depositions of Joe T. Seidbold and Sherwin Koopmans;

(c) all documents attached to the Complaint, Motion to Dismiss, and the briefs relating to the Application for Preliminary Injunction.[1]

(B) *Additional Facts*

The letter agreements pursuant to which MBNB provided a total of $17.1 million in federal funds (referred to in Stipulated Fact 8 above and which funds form the basis of this litigation) to MBank Dallas expressly provided that "these funds are sold to [MBank Dallas] until further notice and may be withdrawn at any time." (See Plaintiff's Exhibits 2–6). It was stipulated that such demands were made and received by MBank Dallas on 3/27/89 and 3/28/89 (see Stipulated Facts 9 & 10 above), prior to the time any action had been taken by the Comptroller of the Currency ("Comptroller") to declare MBank Dallas insolvent or to transfer its assets to FDIC/Receiver.

After the close of business on 3/28/89, the Comptroller issued an *ex parte* order declaring MBank Dallas insolvent and appointing FDIC as Receiver for MBank Dallas. The FDIC immediately transferred the deposits, most liabilities, and most assets of MBank Dallas to the Bridge Bank, a newly created bank wholly owned by the FDIC under a Purchase and Assumption Agreement (hereinafter "P & A Agreement").

Under the terms of the P & A Agreement between Bridge Bank and the FDIC as Receiver for MBank Dallas, the Bridge Bank expressly assumed the

liabilities, if any, for federal funds purchased and overdrafts in accounts maintained with other banks (including any accrued but unpaid interest thereon), *excluding, however, any such liabilities owed to the Failed Bank's parent holding company or to any Subsidiary or Affiliate of the Failed Bank or of the Failed Bank's parent holding company, as of Bank Closing.*

Plaintiff's Exhibit 15 at 8, § 2.1(f) (emphasis added). At the same time, the FDIC/Receiver assigned all right, title and interest of most of MBank Dallas' assets to Bridge Bank, including cash. *Id.* at 9, § 3.1. The consideration paid for the assigned assets was Bridge Bank's assumption of MBank Dallas' liabilities. *Id.* at 11, § 3.2. Thus, Bridge Bank assumed the assets and most liabilities of MBank Dallas, but did not assume MBank Dallas' debt to MBNB.

## II. Standards for Preliminary Injunction

As Plaintiff sets forth in its Brief, the Fifth Circuit's criteria for determining that a preliminary injunction will be granted are:

(1) a substantial likelihood that plaintiff will prevail on the merits;

(2) a substantial threat that irreparable injury will result if the injunction is not granted;

(3) the threatened injury to the plaintiff outweighs any damage to defendant from issuance of an injunction; and

(4) granting the preliminary injunction will not disserve the public interest.

*Plains Cotton Cooperative Association v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1259 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987);

---

1. Several other documents were specifically stipulated as admissible by the parties. See Stipulations of Fact, filed 6/23/89, items 19(a) through (p).

*Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).

Each of these factors must be considered to determine whether, on balance, they collectively favor granting the injunction. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories*, 815 F.2d 500, 503 (8th Cir. 1987). If the plaintiff fails to carry its burden on any one of these four factors, a preliminary injunction cannot be granted. *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir.1985).

III.  Application of Standards and Analysis

(A) *Substantial likelihood that Plaintiff will prevail on the merits*

(1) *Claim for Ratable Distribution*

■ The National Bank Act, codified in part at 12 U.S.C. § 194 (Act June 3, 1864, c. 106, § 50, 13 stat. 114), and made applicable to the FDIC by 12 U.S.C. § 1821(d), provides in pertinent part that:

> [T]he comptroller [receiver] shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction....

The National Bank Act, codified in part at 12 U.S.C. § 91, and also made applicable to the FDIC by 12 U.S.C. § 1821(d), further provides in part that:

> All transfers of ... evidences of debt owing to any national banking association, ... and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, ... shall be utterly null and void; and no attachment, injunction, or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court.

Early on, the United States Supreme Court held that 12 U.S.C. § 194 required that ratable dividends must be proportionate, and that "[t]o be proportionate they must be made by some uniform rule. They are to be paid on all claims against the Bank previously proved and adjudicated. All creditors are to be treated alike." *White v. Knox*, 111 U.S. 784, 786, 4 S.Ct. 686, 687, 28 L.Ed. 603 (1884).

In *First Empire Bank v. FDIC*, 572 F.2d 1361 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), the FDIC as Receiver sold most of the assets of the insolvent United States National Bank of San Diego ("USNB") to Crocker National Bank in exchange for Crocker's assumption of most of USNB's liabilities through a purchase and assumption agreement. However, the FDIC excluded from the liabilities assumed by Crocker certain letters of credit that had been issued to several banks, one of which was the plaintiff, First Empire. The FDIC contended that under 12 U.S.C. § 1823(e), the FDIC was authorized to act upon such terms and conditions as it may determine without any restriction from §§ 91 and 194.

Section 1823(e), which authorizes the FDIC to make loans implementing P & A agreements, provides in part:

> Whenever in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation, ... the Corporation may, *upon such terms and conditions as it may determine*, make loans secured in whole or in part by assets of an open or closed insured bank, which loans may be in subordination to the rights of depositors or other creditors.... (emphasis added).

The FDIC Receiver contended, as it does in the instant case, that in rejecting the claims of banks that were so unwise as to extend credit to the failed bank it was acting reasonably so as to reduce the risk of loss to FDIC Corporate's insurance fund. The court first noted that:

> It is the proceeds of a purchase and assumption agreement that must be ratably distributed under § 194. Here receivership assets (including the cash borrowed from the Corporation) were sold in

exchange for Crocker's assumption of debts. That assumption, then, as proceeds of the sale, constitutes a distribution of assets which must give ratable recognition to the rights of creditors of the receivership.

*First Empire,* 572 F.2d at 1370 n. 3 (citations omitted). The court then rejected the FDIC's argument, reasoning that it could not have been the congressional intent "to have the fiscal integrity of the deposit insurance fund ... outweigh the policy of equitable and ratable payment of creditors in this manner and to permit the FDIC, whenever it felt its action to be reasonable and to serve to protect the deposit insurance fund against loss, to prefer some creditors over others—paying some in full while others received little or nothing." *Id.* at 1371. The court held that §§ 91 and 194 required that the FDIC compensate the banks whose liabilities were not assumed, and that the FDIC was obligated "to render the distribution ratable". *Id.*

In *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538, 541–42 (9th Cir.1987), the Ninth Circuit later further explained its holding in *First Empire* as follows:

> Based on [12 U.S.C. §§ 91 and 194], we concluded that a receiver could not enter into a purchase and assumption agreement that did not provide for the assumption of all creditors' claims. We

made clear that if the purchase and assumption agreement had reserved sufficient assets in the receivership to allow distribution to unassumed creditors, then the distribution would have been upheld. Because the FDIC had not done so, we required it to compensate the creditors whose claims were not assumed by the acquiring bank.

*Woodbridge Plaza,* 815 F.2d at 541–42.[2]

The FDIC argues that the requirements of ratable distribution set forth in § 194 have not been violated because the Contract of Sale provides that the Receiver is obligated to pay to MBNB the pro rata amount that it would have received had there been a liquidation rather than a P & A transaction.[3] The Court disagrees based upon the U.S. Supreme Court's holding in *White v. Knox,* 111 U.S. 784, 786, 4 S.Ct. 686, 687, 28 L.Ed. 603 (1884): "All creditors are to be treated alike." To provide that MBNB and other MCorp affiliate banks are to be treated one way, *i.e.,* that they shall be paid a pro rata amount of what they would have received had there been a liquidation, is decidedly different than the treatment accorded other unrelated creditors in the instant case, *i.e.,* payment of 100% of their similar claims against the failed MBank Dallas.

---

**2.** In *FDIC v. Texarkana National Bank,* 874 F.2d 264 (5th Cir.1989) and *FDIC v. Texarkana National Bank,* No. 88–2216 (5th Cir. 7/19/89, per curiam), the Fifth Circuit recently adopted and then withdrew its adoption of the reasoning of *First Empire* and *Woodbridge Plaza.* In its adoption of the reasoning, the Fifth Circuit held that FDIC Corporate was liable to an insolvent bank's unassumed creditors whose liabilities were not assumed in a P & A transaction, and stated:

> In *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538, 541–42 (9th Cir.1987), the court made it clear that the FDIC Corporate is liable to the insolvent bank's unassumed creditors when FDIC Receiver fails to leave adequate assets in the receivership to pay the unassumed creditors' claims. *See also First Empire Bank v. FDIC,* 572 F.2d 1361, 1371 (9th Cir.1978).

*Texarkana National Bank,* 874 F.2d at 270.

It is later withdrawal of the portion of the opinion in *Texarkana* that adopted the *First Empire* rationale, quoted above, the Fifth Cir-

cuit stated that by so withdrawing its adoption, it "avoids concluding that Texarkana National Bank is entitled to a pro-rata share of its claim to the same extent as other creditors." The Fifth Circuit reached the same result of full payment of the Texarkana National Bank claim by substituting the following reasoning:

> Under the case of *Interfirst Bank Abilene, N.A. v. FDIC,* 777 F.2d 1092 (5th Cir.1985), this undisputed amount is properly set off in full as a contract claim against GBSB's contract claims against TNB.

Thus, for the first time in this Circuit, the court is faced with the issues presented herein.

**3.** *See* Plaintiff's Exhibit 16 at 11: "[T]he Receiver shall make payment of that portion ... of each such proved claim as ultimately may be determined by the Receiver to equal the amount which would have been paid with respect to each such proved claim in the event that the Failed Bank had been liquidated in receivership rather than handled through a purchase and assumption transaction ...".

It is this Court's opinion, therefore, that the FDIC Corporate has violated the statutory provisions requiring ratable distribution as set forth in 12 U.S.C. § 194.

■ With regard to MBNB's claim for interest on the $17.1 million in federal funds, the allowance of such interest must also comply with the requirement of 12 U.S.C. § 194 that the assets of the insolvent bank be ratably distributed among the creditors. The Court notes that "while interest, after insolvency of the bank, cannot be included in the claim against the bank, it is proper to allow interest upon an erroneously disallowed claim from the date a ratable amount was paid to other creditors." *InterFirst Bank Abilene v. FDIC,* 590 F.Supp. 1196, 1200 (W.D.Tex.1984), *aff'd,* 777 F.2d 1092 (5th Cir.1985), *quoting First Empire Bank v. FDIC,* 634 F.2d 1222, 1224 (9th Cir.1980). Because there was a dividend paid to all creditors by way of the P & A agreement's provision for the assumption of MBank Dallas' liabilities to creditors other than MBNB and affiliated MBanks, such dividend occurring on 3/28/89, the Court is of the opinion that MBNB is entitled to interest on the $17.1 million from 3/29/89 until the date said funds are distributed to MBNB.

### (2) *Prohibition of Attachments*

Defendants argue that to grant the Plaintiff's preliminary injunction and MBNB's prayer, *i.e.,* to order the $17.1 million to be paid into the registry of the court "in the name of New Braunfels and for its account ... pending further order of the Court or the final disposition of this action", would be to effect a prejudgment attachment in contravention of both 12 U.S.C. § 1819(a) (Fourth) and § 91, and would be a violation as well of the prohibition against injunctions found in § 91.

Title 12 U.S.C. § 91, pertaining to national banks, provides in part that:

[N]o attachment, injunction, or execution, shall be issued against [a national bank] or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court.

■ In *Pacific National Bank of Boston v. Mixter,* 124 U.S. 721, 727, 8 S.Ct. 718, 721, 31 L.Ed. 567, 571 (1888), the Supreme Court held that the effect of 12 U.S.C. § 91 was to prohibit the availability of the remedy of prejudgment attachment as against national banks, "and in this way it operates as well on the courts of the United States as on those of the states."

The absolute prohibition against attaching a national bank's property found in *Mixter* has been more recently narrowed by the United States Supreme Court in *Third National Bank v. Impac Ltd., Inc.,* 432 U.S. 312, 97 S.Ct. 2307, 53 L.Ed.2d 368 (1977). The Court in *Third National* construed § 91 to prohibit only "prejudgment seizure of bank property by creditors of the bank", *id.* at 324, 97 S.Ct. at 2314, 53 L.Ed.2d at 377, and thus permitted an injunction to issue to prevent a national bank from foreclosing upon the plaintiff's property. The Court construed the anti-injunction provision in § 91 to relate only to a creditor's seizure of bank property, *i.e.,* to the issuance of prejudgment attachments against bank property, rather than to foreclose altogether the availability of the equitable remedy of injunctive relief.[4] Thus it is clear that injunctive relief against a national bank may be obtained notwithstanding § 91.

After noting that the provision barring prejudgment writs of attachment was aimed at preventing preferences by creditors by attaching assets of the bank to satisfy creditors' debts, *id.* at 322, 97 S.Ct. at 2313, 53 L.Ed.2d at 376, the Court in

---

4. [T]he anti-injunction provision itself bears strong signs that it was meant to have limited scope.... The word "injunction" is sandwiched between the words "attachment" and "execution". Both are writs used by creditors to seize bank property.... The implication is strong that Congress intended only to prevent state judicial action, prior to final judgment, which would have the effect of seizing the bank's property.

We cannot believe that Congress intended to give national banks a license to inflict irreparable injury on others, free from the normal constraints of equitable relief.

*Id.* at 322–23, 97 S.Ct. at 2313–14, 53 L.Ed.2d at 376–77.

*Third National* held that "[f]airly read, [§ 91] merely prevents prejudgment seizure of *bank property* by creditors of the bank." *Id.* at 324, 97 S.Ct. at 2314, 53 L.Ed.2d at 377 (emphasis added).

Therefore, it is this Court's opinion that prejudgment attachment of property *not* owned by a national bank, but which property is only held by such a national bank for the benefit of a creditor, is not prohibited by § 91. It is therefore further the opinion of this Court that *Third National* would permit the issuance of an injunction and prejudgment writ of attachment against a national bank with respect to preserving a creditor's own property pending final resolution of the merits of an underlying action. Thus, with respect to the permissibility of an injunction ordering relief in the nature of an attachment in the instant case, the $17.1 million in federal funds in controversy would need to be the property of MBNB in order for an injunction to permissibly be issued with regard to said funds. In this regard MBNB claims that the funds are its property pursuant to a constructive trust. First, however, the Court must address the issue of whether the relief sought by MBNB is in fact an attachment.

In *Wilder v. Inter–Island Steam Navigation Co., Ltd.,* 211 U.S. 239, 245–46, 29 S.Ct. 58, 61, 53 L.Ed. 164, 167 (1908), the United States Supreme Court defined attachment as "a writ the object of which is to hold property to abide the order of the court for the payment of a judgment in the event the debt shall be established."[5] Attachment has also been defined as "a form of execution issued before judgment. It is an ancillary proceeding to preserve intact the defendant's title to the attached property, so that it may be applied to the plaintiff's debt when established." *Stewart v. Rockdale State Bank,* 52 S.W.2d 915, 916 (Tex.Civ.App.—Austin 1932), *aff'd,* 79 S.W.2d 116 (Tex.1935).

■ MBNB denies that what it seeks falls under the label of "prejudgment attachment". Rather, it asserts that the relief it seeks is an affirmative injunction to enjoin the FDIC's continuing violation of the provisions of § 194 for a ratable distribution, which continuing violation is allegedly resulting in irreparable harm to MBNB. Furthermore, MBNB asserts that it seeks the return of its *own* property pursuant to a constructive trust, and therefore does not seek an attachment of the Defendants' property.

Notwithstanding this Court's finding that Defendants have violated the ratable distribution requirements of § 194, the Court is of the opinion that the relief MBNB seeks herein by way of an injunction is in the nature of an attachment. Therefore, MBNB's Application for Preliminary Injunction must not only meet the traditional criteria for granting injunctive relief set forth *supra* at 5, but must pass muster under the law governing the issuance of attachments as well.

■ Title 12 U.S.C. § 1819(a) (Fourth), part of the Federal Deposit Insurance Act and applicable to attachments against the FDIC, provides in part as follows:

> No attachment or execution shall be issued against the Corporation or its property before final judgment in any suit, action, or proceeding in any State, county, municipal, or United States court.

MBNB relies upon the Court's holding regarding § 91 in *Third National, supra,* for the proposition that because prejudgment attachments are permissible against national banks, that attachments are permissible against the FDIC under § 1819(a) (Fourth). Plaintiff cites no case law for

---

**5.** "Execution", also prohibited by the language of § 91, has been defined as the "putting into effect of final judgment of court." *Black's Law Dictionary* at 678 (1968 ed.). With reference to attachment and execution and their meanings, the Supreme Court in *Wilder* also cited and quoted *Thomson v. Baltimore & S. Steam Co.,* 33 Md. 312 at 318 (1870) as follows:

> An attachment has but few of the attributes of an execution; the execution contemplated by the statute being the judicial process for obtaining the debt or damages recovered by judgment, and final in its character, while the attachment is but mesne process, which may or may not affect the property seized.

*Wilder,* 211 U.S. at 246, 29 S.Ct. at 61, 53 L.Ed. at 167.

such proposition, however, and the Court has found none. Therefore, the Court is of the opinion that § 1819(a) (Fourth) bars an attachment against the FDIC.

### (B) *Governing law and standards for ordering an attachment*

■ Fed.R.Civ.P. 64 provides in part that:

> [A]ll remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought.... The remedies thus available include arrest, attachment, ... and any other corresponding or equivalent remedies, however designated.... [6]

Statutory requirements for issuing a writ of attachment in this case are governed, therefore, by Tex.*Civ.Prac. & Rem.Code* Ann. § 61.001 (Vernon 1986), which requires, *inter alia,* that "the plaintiff will probably lose his debt unless the writ of attachment is issued". Plaintiff MBNB has not made a showing that any of the Defendants herein, including the FDIC in both its capacities, and The Deposit Insurance Bridge Bank, will abscond with any judgment which may ultimately be entered on MBNB's behalf, or that any of the named defendants herein will be unable to satisfy any judgment after a judgment herein is entered.

It is this Court's opinion, therefore, that MBNB does not satisfy the statutory requirements necessary in order that it may have its debt secured through an injunction in the nature of an attachment. Therefore, MBNB's Application for Preliminary Injunction must fail, and is accordingly DENIED.

### Conclusion

Although the Court has found that MBNB should prevail on the merits considering the status of the law as of August 8, 1989,[7] the Court is of the opinion that the relief sought by Plaintiff in its Application for Preliminary Injunction is in the nature of an attachment and that Plaintiff is barred from its requested preliminary injunction by its failure to satisfy the requisites for the issuance of an attachment, *i.e.,* the Court finds that the Plaintiff will probably *not* lose its debt if the writ of attachment is not issued. See Tex.*Civ.Prac. & Rem.Code* Ann. § 61.001. Therefore, it is not necessary for the Court, at this time, to address the other standards necessary for the issuance of an injunction, and MBNB's contention of a constructive trust in its favor relative to its Application for Preliminary Injunction is moot. Accordingly, IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiff MBank New Braunfels' Application for Preliminary Injunction is DENIED.

SO ORDERED.

---

**6.** In *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 436 n. 10, 94 S.Ct. 1113, 1123 n. 10, 39 L.Ed.2d 435, 449 n. 10 (1974), the United States Supreme Court noted that it was long-settled federal law that in all cases in federal court "state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to secure satisfaction of the judgment ultimately entered. See Fed.Rule Civ. Proc. 64."

**7.** The Court takes judicial notice that President Bush signed into law, on August 9, 1989, the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). The Court would further note that § 212 of FIRREA could directly apply and serve as the basis for a motion to amend this order. However, because the Court has not yet been briefed by the parties as to this new law or its effective date, this opinion shall govern this case pending such a motion and briefing by the parties herein.