**TEXAS AMERICAN BANCSHARES, INC., et al., Plaintiffs,**

v.

**Robert Logan CLARKE, Comptroller of the Currency, et al., Defendants.**

**Civ. A. No. 3–89–1864–H.**

United States District Court, N.D. Texas, Dallas Division.

June 25, 1990.

---

Marvin S. Sloman & Peter Tierney, Carrington Coleman Sloman & Blumenthal, Dallas, Tex., and Bruce E. Clark, Patricia A. Connell and Mark Holmes, Sullivan & Cromwell, New York City, for plaintiffs.

Robert W. Patterson, Robert F. Reklaitis & Nancy J. Anglin, Hopkins & Sutter, Dallas, Tex., for defendant FDIC.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

The case is before the Court on cross-motions for summary judgment by Plaintiffs and the FDIC.

## I. FACTUAL BACKGROUND

*Stipulated Facts*

The following facts are taken from the Stipulation of Undisputed Facts, filed October 5, 1989 ("Stipulated Facts").

1. Plaintiff Texas American Bancshares, Inc. ("TAB Holding") is a bank holding company registered under the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841 *et seq.* It was the sole owner of 22 national banks and two Texas state-chartered banks and several non-banking subsidiaries. Ten of the TAB national bank subsidiaries are denominated here as the "Plaintiff National Bank Subsidiaries." The two Texas state-chartered banks are denominated "Plaintiff State Bank Subsidiaries." TAB Holding, the Plaintiff National Bank Subsidiaries, and the Plaintiff State Bank Subsidiaries are the plaintiffs in this action; they are referred to collectively as "Plaintiffs."

2. Defendant Robert Logan Clarke, the Comptroller of the Currency (the "Comptroller"), is an official of the United States government within the Department of the Treasury. Plaintiffs originally sued the Comptroller for wrongfully declaring the Plaintiff Banks insolvent.

3. Defendant Kenneth W. Littlefield is the Banking Commissioner of Texas (the "Commissioner").

4. The Federal Deposit Insurance Corporation ("FDIC") was created by the Banking Act of 1933. As of July 20, 1989, the critical date in this action, the FDIC was authorized and operated pursuant to the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1811 *et seq.* Plaintiffs sue the FDIC in its corporate capacity and as receiver for the TAB Plaintiff Banks.

5. As of July 20, 1989, each of the Plaintiff National Bank Subsidiaries was subject to the regulatory jurisdiction of the Comptroller. Each of the Plaintiff State Bank Subsidiaries was subject to the regulatory jurisdiction of the Commissioner. Deposits in the Plaintiff Banks were in-sured by the FDIC in its corporate capacity.

6. The lead TAB subsidiary bank was TAB/Ft. Worth ("TAB/FTW") which had 46% of the total assets of the TAB subsidiary banks as of December 31, 1988.

7. TAB/FTW maintained obligations in the form of Fed funds, certificates of deposit ("CDs"), and other deposit obligations or a combination thereof, to other TAB subsidiary banks, as well as to other creditors outside the TAB system, in the following approximate [1] amounts:

   a. over $675 million in the form of Fed funds purchased from other TAB subsidiary banks;

   b. over $10 million in the form of Fed funds purchased from non-affiliated banks;

   c. over $84 million in the form of additional short term borrowed funds from non-affiliates;

   d. over $120 million in the form of CDs sold to other TAB subsidiary banks;

   e. over $54 million in the form of demand deposits of other banks, including but not limited to other TAB subsidiary banks; and

   f. over $1.12 billion in the form of additional deposits of non-affiliates.

8. Certain of the TAB subsidiaries were in poor financial shape in 1988. In October 1988, after the failure of an initial restructuring plan in which TAB Holding and its subsidiaries participated, the FDIC began soliciting bids for a purchase and assumption ("P & A") agreement from private investors to buy all or part of the TAB banking system. TAB Holding and its subsidiaries did not participate in the bidding process or in the negotiations.

9. In March 1989, the Comptroller commenced an on-site examination at all the TAB subsidiary national banks. On June 30, 1989, the Comptroller sent TAB Holding and each of its national bank subsidiaries the Reports of Supervisory Activity produced in the course of that examination. The Comptroller conducted no further ex-

---

1. The parties have not agreed on the precise amounts of the TAB/FTW obligations, but they do agree that the differences are not material for purposes of the summary judgment motions.

amination activity prior to the closing of the TAB national bank subsidiaries on July 20, 1989.

10. On June 9, 1989, the FDIC received a proposal from Ronald Steinhart to acquire all the TAB banks on behalf of Deposit Guaranty Bank (the "Steinhart Proposal"). The Steinhart Proposal contemplated that all the TAB bank subsidiaries would be closed.

11. On July 18, 1989, the FDIC Board of Directors formally accepted and approved the Steinhart proposal from among four proposals submitted to the Board. The terms of the other three proposals do not appear in the record. At that time the FDIC Board also resolved that upon the closing of TAB/FTW, the FDIC would arrange a P & A transaction with the Bridge Bank that would result in the payment in full of the probable claims of all the non-subordinated general creditors of TAB/FTW except for the obligations owed to creditors who were TAB Holding subsidiaries.

12. On July 20, 1989, the Comptroller declared each of the TAB subsidiary banks, except those suing here, insolvent and appointed the FDIC as receiver of each. The parties agree that the TAB subsidiary banks that are not suing here were insolvent.

13. In connection with the insolvency of TAB/FTW, the FDIC obtained court approval for the transactions set forth in a P & A agreement, an indemnity agreement, and a contract of sale. Pursuant to those documents, all the obligations of TAB/FTW were assumed in full by the Bridge Bank *except for* (1) the Fed funds sold to TAB/FTW by other TAB subsidiary banks; (2) the CDs in excess of $100,000 purchased from it by other TAB subsidiary banks; and (3) certain contingent and off-book liabilities.

14. On that same day, July 20, 1989, the FDIC gave the Comptroller a statement that the TAB subsidiary banks would receive no more than 67% of the face amount of the TAB/FTW liabilities owed to each TAB subsidiary bank.

15. Thereafter, the Comptroller decided that each of the ten Plaintiff National Bank Subsidiaries was insolvent, and appointed the FDIC as receiver for each.

16. If the liabilities of TAB/FTW to the Plaintiff National Bank Subsidiaries had been paid or assumed in full, the Comptroller admits that he would not have declared any of the Plaintiff National Bank Subsidiaries insolvent.

17. Prior to the closing of the TAB subsidiary banks on July 20, 1989, the Texas Banking Commissioner was in contact with the FDIC. The FDIC informed the Commissioner of the substance of the decisions made by the FDIC Board of Directors on July 18, 1989.

18. On July 20, 1989, the FDIC informed the Commissioner of the closing of TAB/FTW, and that the TAB/FTW liabilities owed to the Plaintiff State Banking Subsidiaries would only be paid at 67% of their face value.

19. The Commissioner thereupon declared each of the Plaintiff State Bank Subsidiaries insolvent and appointed the FDIC as receiver for each.

20. If the liabilities of TAB/FTW to the Plaintiff State Bank Subsidiaries had been paid or assumed in full, the Commissioner admits that he would not have declared either of them insolvent on that date.

21. On July 20, 1989, Plaintiffs moved for a temporary restraining order from this Court to prevent the declaration of their insolvency and sale. After a conference with counsel, the Court denied the TRO request on July 21, 1990.

22. Subsequently, the parties agreed to allow the sale of the TAB system to go forward, and to submit the case for disposition on cross-motions for summary judgment and stipulated facts. The parties further agreed that if the FDIC is held liable to the Plaintiffs, Plaintiffs will recover $5 million in lieu of other recovery.

*Further Allegations by Plaintiffs*

Plaintiffs assert that in effect, the FDIC assessed TAB Holding and its solvent affiliates for the losses the FDIC expected to incur in connection with the failure of the

"truly insolvent" TAB bank subsidiaries. The real reason behind the exclusion of Plaintiffs' claims from the assumption agreement, Plaintiffs contend, was a need by the FDIC to fulfill its contractual commitment to Deposit Guaranty to sell the entire TAB banking system as a package, including the solvent banks. The only way the FDIC could sell the solvent banks was to declare them insolvent, and the only way to do that was to devalue their assets placed in TAB/FTW. This allegation is strongly supported by the following evidence:

(1) the Comptroller is a member of the FDIC Board of Directors and participated in the meetings and decisions of the FDIC's Board of Directors leading up to the events of July 20, 1989, Stipulated Facts at ¶ 7;

(2) the Comptroller investigated and reported upon the status of the Plaintiff banks shortly before July 20, and did not criticize the Fed funds bought from, or the CDs on deposit with, TAB/FTW in that report, Stipulated Facts at ¶ 23; Affidavit of Joseph M. Grant, filed October 30, 1989, at ¶ 3;

(3) TAB Holding's chairman alleges that he was advised that he should keep the level of interbank obligations steady to avoid the FDIC taking action to close all the banks, Affidavit of Joseph M. Grant, filed October 30, 1989, at ¶¶ 5–7;

(4) the Steinhart Proposal, accepted by the FDIC before the closure of any of the banks, assumed that all of the TAB banks would be sold as a package;

(5) the Comptroller and the Commissioner both have admitted that if the assets of the Plaintiff Banks in TAB/FTW had been paid in full, they would not have declared the Plaintiff Banks insolvent.

The FDIC argues in response that the decision to exclude the TAB-affiliated claims was designed to further its statutory mission to preserve confidence in the banking system while protecting the Insurance Fund. This goal was accomplished by maintaining only those customer relationships which it believed to be important to the survival of the assuming bank and to the continued stability of the banking com-

munity. Further, making "enhanced payments" to the TAB banks would "reward" TAB Holding—the holding company under whose management this banking group failed.

Under the National Bank Act, the Comptroller and the FDIC are required to distribute the assets of a closed national bank ratably. Plaintiffs argue that the devaluation of the obligations owed by TAB/FTW to the other TAB subsidiaries, when compared to the assumption and payment in full of all of TAB/FTW's other liabilities, is an unequal distribution in violation of Defendants' statutory authority.

The FDIC responds that the Act only requires the FDIC/Receiver to distribute the assets of the failed institution ratably; thus, any non-insured creditor is entitled only to what it would have received in a liquidation of the failed bank's assets. The fact that the FDIC/Corporate chose, for policy reasons, to make "enhanced payments" to other creditors is a matter committed to the discretion of the FDIC/Corporate.

## II.  ANALYSIS

### Judicial Review

The FDIC asserts that its actions are unreviewable by the judiciary. None of the reasons proffered by the FDIC preclude judicial review.

First, the FDIC asserts that 12 U.S.C.A. § 1821(j) (West 1990) prohibits the Court from hearing the case. That section, enacted as part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183 (Aug. 9, 1989), after the commencement of this case, bars courts from restraining or affecting the exercise of powers or functions of the FDIC as a receiver. This amendment clearly does not bar the relief Plaintiffs seek from FDIC/Corporate. Furthermore, the Supreme Court held in *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 109 S.Ct. 1361, 1369–70, 103 L.Ed.2d 602 (1989) that the analogous provision for FSLIC

does not bar a creditor from adjudicating its claims against the receiver in federal court.[2] Finally, even if FIRREA is interpreted as barring this Court from granting the relief sought by Plaintiffs, it may not be retroactively applied to the present case. Statutes affecting substantive rights and liabilities are presumed to have only prospective effect unless Congress indicates to the contrary. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 207, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("[C]ongressional enactments ... will not be construed to have retroactive effect unless their language requires this result."). *But see Kaiser Aluminum & Chem. Corp. v. Bonjorno*, —— U.S. ——, ——, 110 S.Ct. 1570, 1576–1577, 108 L.Ed.2d 842, 58 U.S. L.W. 4421, 4424 (U.S. Apr. 17, 1990) (two lines of Supreme Court cases on retroactive effect of statutes). No such indication is present here. *See infra* at pp. 1251–52 and citations therein.

■ Second, the FDIC argues that former section 1823(c)(2)(A) of Title 12 committed to the FDIC's sole discretion the power to prescribe the terms of P & A transactions, thus making judicial review unavailable under section 701(a)(2) of the Administrative Procedures Act ("APA"). 5 U.S.C. § 701(a)(2). The relief requested in this case did not require the FDIC to change the terms of the P & A agreement, but would require the FDIC to treat the unassumed creditors equally with the assumed creditors. Section 1823(c)(2)(A) does not override the FDIC's obligation to act "in conformity with the provisions of law relating to the liquidation of closed national banks," 12 U.S.C. § 1821(d), most especially to treat creditors equally. Thus, as the Ninth Circuit noted in *First Empire Bank–New York v. FDIC*, 572 F.2d 1361 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), the FDIC could structure the P & A transaction as it wishes, but it had to "stand ready to render the distribution ratable—to supplement the remaining assets should they fall short." *Id.* at 1371.

■ Third and finally, the FDIC contends that the suit is barred under the APA provision prohibiting suits for "money damages." 5 U.S.C. § 702. This suit is for specific relief, not money damages, although the parties have stipulated to an amount of money damages in lieu of other relief. The Supreme Court, in permitting a suit to recover Medicaid payments, relied upon this distinction, quoting with approval from the D.C. Circuit in *Maryland Dep't of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441, 1446 (D.C.Cir.1985) (emphasis in original): "The term 'money damages,' 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 2732, 101 L.Ed.2d 749 (1988). This suit is analogous to *Bowen:* in both cases, the plaintiffs sought to vindicate their right to funds to which a federal statute entitled them, rather than money to compensate them for the losses they may have suffered because of the withholding of the funds. *See National Ass'n of Counties v. Baker*, 842 F.2d 369, 373 (D.C. Cir.1988), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 775 (1989).

■ The FDIC's final argument is that Plaintiffs' suit is barred by sovereign immunity. This argument is also without merit.

Section 1819(a) (Fourth) of Title 12 expressly authorizes the FDIC to "sue and be sued, complain and defend, in any court of law or equity, State or Federal." The Ninth Circuit rejected the FDIC's defense of sovereign immunity in *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 542–43 (9th Cir.1987), relying primarily on the Supreme Court's direction in *Franchise Tax Board v. United States Postal Service*, 467

---

**2.** *Coit* was decided on March 21, 1989, fully three months before FIRREA was enacted, yet the provision in FIRREA retains the same wording construed by the Supreme Court in *Coit* to allow such suits.

U.S. 512, 519–21, 104 S.Ct. 2549, 2553–54, 81 L.Ed.2d 446 (1984), that "sued and be sued" authorization should be construed broadly, particularly for quasi-private governmental entities. In *Franchise Tax Board,* the Supreme Court noted that the Postal Service was meant to be run like a business and to be self-supporting. Similarly, the FDIC has the same broad "sue and be sued" language in its governing statute, and it relies on premiums from insured banks and the income therefrom. Thus, the FDIC is not entitled to claim sovereign immunity. *See also Coit Independence Joint Venture v. FSLIC,* 109 S.Ct. at 1370–71 (Congress clearly intended courts to have jurisdiction over claims by creditors against FSLIC).

*National Bank Act*

■ Having found that judicial review is available, the Court returns to the heart of the controversy: the interpretation and application of the National Bank Act ("NBA"). Act of June 3, 1864, 13 Stat. 99.

Sections 91 and 194 of the National Bank Act require the Comptroller and the FDIC as receiver to distribute an insolvent national bank's assets ratably among all unsecured creditors. 12 U.S.C. § 194, made applicable to the FDIC by 12 U.S.C. § 1821(d), provides in pertinent part (emphasis added):

> From time to time, ... the comptroller [through the receiver] shall make a *ratable dividend* of the money so paid over to him ... on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction....

12 U.S.C. § 91, also made applicable to the FDIC by 12 U.S.C. § 1821(d), provides that any preferential transfer is void.

> All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; ... and all payments of money ... made after the commission of an act of insolvency, or in contemplation thereof, made with a view to ... the preference of one creditor to another ... shall be utterly null and void.

The simple question presented here is whether the assumption and payment in full of all creditors of like stature by the FDIC to the exclusion of the Plaintiffs is a preference prohibited by these provisions.

The first step in the analysis is to determine whether the question may be answered solely by reference to the plain language of the statute. Unfortunately, the National Bank Act was enacted before purchase and assumption transactions were common, and thus the Act only provided clear rules for the liquidation of a bank. In such a case, the FDIC is required to distribute the assets of the failed bank "ratably," and to avoid any preference of one creditor over another. On their face, the two provisions indicate a congressional intent that the governmental agencies involved in the winding up of a failed bank act with absolute fairness toward all creditors, giving no creditor a preference over another. The transaction at issue here, the payment in full of some creditors while paying only a portion of other creditors with precisely the same type of claims, appears on its face to be a violation of the statute.

But the FDIC argues strenuously that the first impression is incorrect, and that the correct interpretation is that the FDIC is only required to ensure a ratable distribution of the value of the failed bank's assets as if it had been liquidated. The FDIC asserts that payment of 67% of the face value of TAB/FTW's obligations to Plaintiffs is equivalent to what the affiliates would have received in a straight liquidation, and that section 194 entitles them to no more. The FDIC further argues that the assumed creditors received "enhanced" payments from the FDIC which do not fall within the bar of section 91. Plaintiffs, of course, vigorously dispute the FDIC's interpretation. Since the NBA contemplated only liquidations, the Court's task is to determine the underlying rule laid forth in the Act, and then apply it to the modern-day P & A transaction.

Few cases interpreting these provisions have been decided. The Supreme Court has spoken only once, but it did so in no

uncertain terms. In *White v. Knox*, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884), the Supreme Court laid down a rule of equality for payments to creditors under section 194.

> [A creditor is entitled] to a share in the proceeds of the assets *equal* to what had been distributed to others.... Dividends are to be paid to all creditors ratably, that is to say, proportionally. To be proportionate they must be made by some *uniform rule*. They are to be paid on all claims against the bank previously proved and adjudicated. *All creditors are to be treated alike.*

*Id.* at 786, 4 S.Ct. at 686 (emphases added).

Only two courts have considered the precise issue here—the legality of discriminating among creditors which the FDIC asserts has been an important and increasingly common practice during the nationwide savings and loan crisis—and both have followed *White v. Knox's* strict rule of equality in ruling against the FDIC. In *First Empire Bank–New York v. FDIC*, 572 F.2d 1361 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), the Ninth Circuit considered a similar purchase and assumption transaction from which the FDIC excluded obligations owing from a failed bank to its former shareholders.

The case arose out the insolvency and receivership of a national bank in California. To avoid the liquidation of the large bank, and the subsequent disruption of money and services to other banks and customers, the FDIC entered into a P & A agreement by which all of the assets and liabilities of the bank were assumed by another bank. Excluded from the transaction were those liabilities owed to a group of the failed bank's shareholders and companies associated with them. These liabilities were excluded because no bank would accept them, the consensus being that those individuals had been involved in the mismanagement, and perhaps even the misuse, of the failed bank's assets. The FDIC also refused to guarantee the obligations,

believing that a guarantee would make good the "tainted" transactions of the individuals the FDIC believed were responsible for the failure of the bank. Subsequently, the FDIC refused to honor the obligations itself, resulting in the complete destruction of their value and large losses to the creditors.

The unassumed creditors sued the FDIC, claiming a violation of the same provisions of the NBA as are at issue here. The FDIC's primary defense was that the National Bank Act did not apply to banks in receivership, and that whenever the FDIC is appointed receiver, it is authorized to act without regard to the restrictions in sections 91 and 194. The FDIC's fallback position was that it had acted to protect the integrity of the deposit insurance fund, the same argument the FDIC makes here.

The Ninth Circuit strongly rejected both these arguments, finding that the FDIC's power was limited by sections 91 and 194. The court determined that the NBA required parity among the assumed and unassumed creditors, and that the payment in full of only some of the unsecured creditors was a clear violation of the Act. Following *White v. Knox's* equality rule, the court required the FDIC to pay the unassumed creditors the same percentage received by the assumed creditors—100%. The Ninth Circuit's holding was reaffirmed in *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 541–42 (9th Cir.1987), in which the court held that under analogous California banking laws, the FDIC could not "pick and choose which creditors will have their claims assumed. Such an interpretation would seriously undermine the law and policy in the California provisions ... which anticipate orderly and equitable treatment of all claims." *Id.* at 541.[3]

The only other court to consider the issue was Judge Porter's of this district in *MBank New Braunfels, N.A. v. FDIC*, 721 F.Supp. 120 (N.D.Tex.1989). The facts of the instant case and *MBank* are strikingly similar. In *MBank*, the FDIC assumed all

---

**3.** The Fifth Circuit originally adopted the Ninth Circuit law in *FDIC v. Texarkana Nat'l Bank,* 874 F.2d 264, No. 88–2216 (5th Cir.1989), but upon a motion by the FDIC later withdrew the paragraph. *FDIC v. Texarkana Nat'l Bank,* No. 88–2216 (5th Cir. July 19, 1989).

the Fed funds and CDs owed to creditors other than the failed bank's parent holding company and its affiliates. As here, the FDIC contended that those banks that "were so unwise as to extend credit to the failed bank," *id.* at 123, deserved no more than their pro rata share of the liquidation value of the failed bank.[4] In so discriminating among creditors, the FDIC insisted it was simply, again as here, "acting reasonably so as to reduce the risk of loss to FDIC Corporate's insurance fund." *Id.* Judge Porter relied on the reasoning of *First Empire* and the plain language of the National Bank Act in concluding that the different treatment accorded to the affiliated creditors was unequal treatment prohibited by the NBA.

> To provide that MBNB and other MCorp affiliate banks are to be treated one way, *i.e.*, that they shall be paid a pro rata amount of what they would have received had there been a liquidation, is decidedly different than the treatment accorded other unrelated creditors in the instant case, *i.e.*, payment of 100% of their similar claims against the failed MBank Dallas.

*Id.* at 124.

In the face of these unanimous decisions requiring parity in treatment among creditors, the FDIC again asserts that all a creditor is entitled to is the value of his holding upon a liquidation of a failed bank.

Since the payment in full of some creditors is done through "supplemental or enhanced" payments from the FDIC acting in its corporate capacity, the FDIC concludes that the equality rule of the NBA does not reach them. In support of its position, the FDIC cites cases construing the bankruptcy avoidable preference statute as not reaching collateral payments to creditors from third parties. The premise of these decisions is that such collateral payments do not decrease the amount in the estate available for distribution to other creditors. Under the statute,

> [t]he test is not what the creditor receives but what the bankrupt's estate has lost. It is the diminution of the bankrupt's estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer.

*Virginia Nat'l Bank v. Woodson,* 329 F.2d 836, 840 (4th Cir.1964). *See also Continental & Commercial Trust & Sav. Bank v. Chicago Title & Trust Co.,* 229 U.S. 435, 444, 33 S.Ct. 829, 831, 57 L.Ed. 1268 (1913) ("The fact that what was done worked to the benefit of the creditor and in a sense gave him a preference is not enough, unless the estate of the bankrupt was thereby diminished.").[5]

The FDIC further points to FIRREA as supporting its position. Section 212(a)[6] of FIRREA provides that creditors are enti-

---

**4.** The FDIC's discrimination against creditors who are affiliated with a failed bank runs counter to the Board of Governors of the Federal Reserve's requirement that parent holding companies continue to put capital into failing subsidiary banks. "[A] bank holding company should stand ready to use available resources to provide adequate capital funds to its subsidiary banks during periods of financial stress or adversity...." Policy Statement, 52 Fed.Reg. 15707, 15708 (1987), quoted in *MCorp Financial v. Board of Governors,* 900 F.2d 852, No. 89–2816 (5th Cir.1990). The Board viewed a bank holding company's failure to do so as an unsafe banking practice. *Id.*

Plaintiffs allege they relied upon the federal regulators' actions in the MCorp situation in maintaining the interbank obligations. Affidavit of Joseph M. Grant, filed October 30, 1989, at ¶ 5.

**5.** The federal Courts of Appeals have consistently recognized and applied this construction of the bankruptcy statute. *See, e.g., Brown v. First Nat'l Bank,* 748 F.2d 490, 491 (8th Cir.1984) (transfer of property must deplete debtor's estate before preferential transfer may be established); *In re Erie Forge & Steel Corp.,* 456 F.2d 801, 805 (3rd Cir.1972) (transfer of debtor's property and depletion of debtor's estate are necessary to constitute preferential transfer); *I-T-E Circuit Breaker Co. v. Holzman,* 354 F.2d 102, 106 (9th Cir.1965) (bankruptcy statute "requires the transfer of the property *of the debtor* in order to create a voidable preference") (emphasis in original).

**6.** The numbering of FIRREA's provisions is confusing. Section 212 has only one subsection—subsection (a)—which is 22 pages long and which revises section 1821 of Title 12. Thus, the section referred to is actually 212(a)"(i)" at 103 Stat. 242–43. It has been codified at 12 U.S.C.A. § 1821(i) (West 1989).

tled to no more than their pro rata share of the liquidation of a failed bank's assets, even if the FDIC chooses to make supplemental payments.[7] In the House Conference Report accompanying the bill, Congress stated that section 212(a) clarifies existing law. H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. 393, 397, *reprinted in* 1989 U.S. Cong. & Admin. News 432, 436. Such statements are entitled to some weight. *See Bell v. New Jersey*, 461 U.S. 773, 784, 103 S.Ct. 2187, 2193, 76 L.Ed.2d 312 (1983) ("[T]he view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value.").

The weight of this evidence is quite limited, however, primarily by the fact that congressional statements on both sides of the issue have appeared, even from Congressman Gonzalez, chairman of the House Committee on Banking, Finance and Urban Affairs. Prior to this lawsuit, on June 15, 1989, the following colloquy took place:

> Mr. Erdreich: Mr. Chairman, is. my understanding correct that enactment of [FIRREA] would not affect in any way the rights of an institution currently involved in litigation with the Federal regulators ...? In other words, the law in effect at the time of the filing of the lawsuit would . be applied, and not the new legislation we are enacting today. Mr. Gonzalez: Yes, it does remain, and, as far as I know, there is no retroactive language in any part of the bill that would have any impact one way or the other on pending litigation.

135 Cong.Rec. H2748 (daily ed. June 15, 1989). In the midst of this lawsuit, however, Congressman Gonzalez rose in the House on October 23, 1990 to make an unsolicited statement confirming the congressional intent to clarify the law with regard to the liability of the FDIC for making "supplemental" payments to some creditors. 135 Cong.Rec. H7358 (daily ed. Oct. 23, 1990). *See also* 135 Cong.Rec. H5003 (daily ed. Aug. 3, 1989) (FDIC's new powers as receiver to be applied prospectively only); 135 Cong.Rec. E3016 (daily ed. Sept. 12, 1989) (new subsection 1821(i) not to be applied to existing receiverships).

Additionally, FIRREA *repealed* 12 U.S.C. § 1821(d), and *added* a new section 1821(i), to provide that "[n]otwithstanding any other provision of Federal law or the law of any State," the maximum liability of the FDIC in either capacity to any creditor "shall equal the amount such claimant would have received" if the FDIC had liquidated the institution. If Congress had to repeal and add a provision to the NBA to make this limitation clear, its intention solely to clarify pre-existing law is suspect.

Third, FIRREA was enacted over 100 years after the National Bank Act, making the 101st Congress' explanation of the intent of the 38th Congress of little value.

Finally, and conclusively for the Court, the only court interpreting the issue prior to the passage of FIRREA *twice* had expressly held that the NBA required equality of payments to assumed and unassumed creditors. *See First Empire*, 572 F.2d at 1371; *Woodbridge Plaza*, 815 F.2d at 540–41. Thus, the actual effect of FIRREA was to overrule prior law, not clarify it.

*Ruling*

After considering the foregoing, the Court concludes that sections 91 and 194 of the NBA did not permit the actions taken by the FDIC in this case. The FDIC's effort to avoid the simple and straightforward requirement of equal distributions to all creditors by relying on an analogy with the bankruptcy voidable preference statute is to no avail. Whatever bankruptcy law might allow, Congress decided that when the federal government became involved with a bank failure, the government, as represented by the FDIC, would have to act with absolute fairness toward *all* creditors. *See White v. Knox*, 111 U.S. at 786, 4 S.Ct. at 686 ("All creditors are to be treated alike."). No provision was made for the FDIC to prefer some creditors over others, *even if those creditors were partially or*

---

7. Because of this change in the law governing the FDIC's liability, the FDIC will not be bound by the equal treatment rule in all receiverships instituted after August 9, 1989.

*fully responsible for the failure of the bank itself.*[8]

Nor is the FDIC's attempt to engraft onto the statute a new limit on a creditor's recovery successful. Nowhere does the NBA refer to the value upon liquidation as the maximum amount any one claimant may receive. And even though Congress explicitly recognized and approved P & A transactions by amending the National Bank Act, it was not until *after* this case commenced that Congress amended the statute to incorporate this new ceiling on a creditor's recovery. In short, the FDIC's assumed power to hold Plaintiffs to the liquidation value of their assets when all other creditors received 100% of their claims is nowhere approved.

This conclusion confirms the bright line rule first eneuciated in *First Empire:* equality of payments means equality. Consequently situations such as the one here are avoided; creditors need not sue for an explanation of why the FDIC discriminated against them. Moreover, this analysis further explains why the cases permitting collateral payments from third parties under the bankruptcy voidable preference statute are not analogous. In those cases, the payor of the collateral payments was not the receiver. Here, the receiver and the payor of the supplemental payments are the same entity acting under two slightly different guises. The appearance of impropriety, whether real or not, in the FDIC/Receiver and the FDIC/Corporate deciding together who gets how much, is quite worrisome, especially in light of the fiduciary duty owed by a receiver to the creditors. *See Phelan v. Middle States Oil Corp.*, 154 F.2d 978, 991 (2d Cir.1946) ("A receiver ... owes a duty of strict impartiality, or 'undivided loyalty,' to all persons interested in the receivership estate, and must not 'dilute' that loyalty."). The Ninth Circuit summarized the analysis most succinctly when it held that

In our judgment it could not have been the congressional intent, upon balance, to have the fiscal integrity of the deposit insurance fund (which can be adequately protected by other more equitable means) outweigh the policy of equitable and ratable payment of creditors in this manner and to permit the FDIC, whenever it felt its action to be reasonable and to serve to protect the deposit insurance fund against loss, to prefer some creditors over others—paying some in full while others received little or nothing.

*First Empire,* 572 F.2d at 1371.

Although *First Empire's* strong language may be distinguished as a reaction to the FDIC's extreme position that it could leave some creditors bereft of any recovery at all while paying others in full, the Ninth Circuit's reasoning is sound, and is adopted by this Court. Additionally, the facts of this case indicate an equally egregious use of the FDIC's extensive (but not unlimited) powers by manipulating the recovery of affiliated banks on the obligations owed to them in order to make those banks insolvent as well. *See supra* at p. 1247, & n. 5.

*First Empire* soundly rejected precisely the rationale advanced by the FDIC for its unequal treatment of TAB/FTW's creditors. The FDIC asserts that since the greatest risk of loss in bank failures falls not on the bank depositors or shareholders but on the FDIC, it is entitled to use its "extraordinary" powers to shift some of that loss to the creditors it selects—without any judicial review over its choice at all. Again, the Ninth Circuit refused to follow along:

To accede to the FDIC's contentions would seriously undermine the policy firmly set forth in § 91 that some creditors are not to be preferred over others, and of § 194 that when distributions are made they shall be ratably made. Under its interpretation of the statutes, the

---

8. Even though Congress did not contemplate P & A transactions when it first enacted sections 91 and 194 because P & A were not yet used, mismanagement of banks was always present. Still, Congress did not except former managers or others involved with the failure of a bank from the rule of equal payments. Thus the FDIC's assumption of the powers, first to determine who was responsible for the failure of the banks, and second to penalize those persons and entities, goes far beyond its authority.

FDIC could (subject only to its concession that it must act "reasonably," but without any apparent applicable standard), pick and choose which creditors should be preferred, or permit the acquiring bank to pick and choose.

*First Empire,* 572 F.2d at 1371. This Circuit has been similarly wary of the FDIC's and the Comptroller's claims of unbridled discretion. The Fifth Circuit warned the Comptroller in *First Nat'l Bank v. Comptroller of the Currency,* 697 F.2d 674 (5th Cir.1983), that he should administer his authority by maintaining a balance between the interests of the government in efficiency and those of the banks in fair treatment. "The Comptroller must not become so obsessed with protecting the integrity of the national banking system that individual banks are arbitrarily treated unfairly." *Id.* at 681. The closure and sale of solvent banks through arbitrary devaluation of their assets in another bank cannot be fair. If the FDIC believed the managers of the TAB system acted illegally, criminal or civil suits should have been brought against them. But in the FDIC's rush to salvage what all admit to be a difficult situation, it could not violate Congress' explicit directive to treat creditors equally by choosing among creditors only those whom it considered worthy of full payment.

### III. CONCLUSION

Under 12 U.S.C. § 194, Plaintiffs are entitled to equal treatment with the assumed creditors. Accordingly, summary judgment is GRANTED for Plaintiffs.

Since the parties have stipulated that Plaintiffs' relief will be $5 million, judgment will be entered for the Plaintiffs in that amount. Plaintiffs shall submit a judgment promptly.

SO ORDERED.