**SENIOR UNSECURED CREDITORS' COMMITTEE OF FIRST REPUBLIC-BANK CORPORATION, et al., Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, et al.,
Defendants.**

Civ. A. Nos. CA3–88–2871–D, CA3–89–1927–D, CA3–89–2361–D and CA3–89–2559–D.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 17, 1990.

William F. Sheehan, Jeffrey C. Martin (argued), Bruce C. Swartz and Christopher E. Palmer of Shea & Gardner, Washington, D.C., Sp. Litigation Counsel, for plaintiffs.

Robert W. Patterson, John L. Rogers, III (argued), Peter F. Lovato, III, William J. McKenna, Robert F. Reklaitis and Lawrence F. Bates of Hopkins, Sutter & Clark, Dallas, Tex., for defendants.

FITZWATER, District Judge:

In 1988 the Federal Deposit Insurance Corporation ("FDIC") undertook "the largest bank rescue effort in history," [1] providing $1 billion in open bank assistance to the flagship bank of the First RepublicBank Corporation ("FRBC") integrated banking system. The assistance effort proved unsuccessful and the flagship bank failed. FRBC's other 40 subsidiary banks were also declared insolvent and closed. FRBC and its wholly-owned subsidiary, IFRB Corporation ("IFRB"), thereafter filed voluntary chapter 11 bankruptcy petitions. Three statutory creditors' committees of these debtors-in-possession now sue the FDIC, contending it exceeded its statutory authority under and violated the Federal Deposit Insurance Act, and violated the National Bank Act, state banking laws, the United States Constitution, the Bankruptcy Code, and federal and state common law and statutory duties in structuring the assistance. The FDIC moves to dismiss the complaint for failure to state a claim, presenting important and novel questions concerning the authority and obligations of the FDIC.

I

Plaintiffs are the Senior Unsecured Creditors' Committee of FRBC, the Junior Unsecured Creditors' Committee of FRBC, and the Unsecured Creditors' Committee of IFRB. They were appointed as statutory creditors' committees by the U.S. Trustee and represent, among others, corporations, partnerships, and individuals who purchased bonds of, or provided goods and services to, FRBC and/or IFRB. FRBC and IFRB are bank holding companies. The U.S. Bankruptcy Court authorized the committees to institute this lawsuit. This court later withdrew the reference and this civil action—consolidated with three others [2]—is now pending in this court. Defendants are the FDIC, in its corporate capaci-

---

1. *See* Tr.Oral Arg. at 1 (John L. Rogers, III, Esq., counsel for the FDIC).

2. CA3–89–1927–D, *First Int'l Bancshares Corp. v. FDIC,* CA3–89–2361–D, *IFRB Corp. v. FDIC,* and CA3–89–2559–D, *First RepublicBank Corp. v. FDIC.*

ty and as receiver for the 41 subsidiary banks of FRBC, and Delaware Bridge Bank, N.A. ("Delaware Bridge Bank").[3]

In 1988 First RepublicBank Dallas, N.A. (the "Dallas Bank") approached the FDIC for financial aid.[4] The FDIC agreed to provide open bank assistance, conditioned on several requirements. FRBC, IFRB, and certain subsidiaries were obligated to enter a Note Purchase Agreement (the "Agreement") with the FDIC. FRBC was required to execute a pledge agreement. Pursuant to the Agreement the FDIC made six-month subordinated loans to the Dallas Bank, in the amount of $800 million, and to First RepublicBank Houston, N.A. (the "Houston Bank"), in the amount of $200 million. The two banks executed notes payable to the FDIC in these respective amounts plus interest. The Agreement required that the $200 million sum advanced to the Houston Bank be transferred immediately to the Dallas Bank by means of a deposit or sale of federal funds. The FDIC assistance was therefore effectively a $1 billion loan to the Dallas Bank.[5]

The FDIC also imposed the requirement that the Dallas Bank use the loan proceeds to repay $1 billion of its outstanding borrowings to the Federal Reserve Bank of Dallas ("FRB–Dallas"). The Agreement required FRBC and IFRB to guarantee unconditionally payment of the two notes. These guaranties were senior to any general obligations of the two companies. FRBC secured its guarantee by entering into an agreement that pledged all the shares then held by it in approximately 30 subsidiary banks and by delivering other property to the FDIC.

The FDIC additionally required that FRBC and IFRB agree to obligate their subsidiary banks [6] to enter into the Agreement and all subsequently did. The subsidiary banks were also required by the Agreement to guarantee payment of the two notes to the extent of the lesser of their primary capital or 95% of their adjusted net worth. These guaranties were subordinated to certain senior obligations of the banks. Moreover, all indebtedness of the Dallas and Houston Banks to the other subsidiary banks existing on March 18, 1988 or subsequently incurred was subordinated to the two banks' general and subordinated obligations, including those to the FDIC.

The Agreement gave the FDIC substantial control over FRBC, IFRB, and the subsidiary banks, preventing them from undertaking numerous transactions and actions without FDIC approval, subjecting them to FDIC-approval of directors and certain officers, granting the FDIC authority to require FRBC and IFRB to merge subsidiary banks, and precluding the subsidiary banks from declaring dividends without FDIC permission.

The Agreement also precluded the Dallas and Houston Banks from reducing the aggregate amounts of their outstanding debt to other subsidiary banks.[7] As of March 18, 1988 the Dallas Bank had outstanding debt of more than $6 billion payable to various subsidiaries and approximately $1.4 billion payable to non-affiliated banks that had sold federal funds to the Dallas Bank. These federal funds purchases amounted to unsecured borrowings by

**3.** Plaintiffs also sued NCNB Texas National Bank and NCNB Corporation. These defendants were dismissed by order filed August 28, 1990.

**4.** In deciding the FDIC's motion to dismiss, the court accepts as true the allegations of plaintiffs' complaint, and views them in the light most favorable to plaintiffs. *See Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1094 (N.D.Tex. 1990).

**5.** In ¶ 59 of their complaint, plaintiffs allege the $1 billion sum should be deemed a contribution to the Dallas Bank. At complaint ¶ 57, however,

they refer to the transaction as being "effectively only a single loan to the Dallas Bank."

**6.** There are also non-bank subsidiaries of FRBC and IFRB.

**7.** This provision was subsequently modified on May 12, 1988. The FDIC granted a limited waiver of the no-reduction requirement, provided the subsidiary banks sold all excess funds at the end of each business day in the form of federal funds to either the Dallas or Houston Bank and that the subsidiary banks did not invest funds in banks not owned by FRBC or IFRB.

the Dallas Bank. The indebtedness to the non-affiliated banks was paid off at approximately this time, while the $6 billion indebtedness to the subsidiary banks was effectively transformed from a general to highly subordinated liability of the Dallas Bank.

On April 30, 1988 the FDIC caused the merger of several subsidiary banks into five existing subsidiary banks. In each merger the relative book values of the stock of the surviving and non-surviving banks did not reflect the relative market, liquidation, and other values of the stocks.

Shortly after the FDIC executed the Agreement, it began soliciting proposals from banks or investor groups interested in taking over some or all of the subsidiary banks. NCNB Corporation ("NCNB"), a bank holding company with principal executive offices in Charlotte, North Carolina, was one bidder.

Acting in concert with one another, NCNB and the FDIC requested a private letter ruling from the Internal Revenue Service ("IRS"). The IRS issued the ruling on June 10, 1988, six weeks before the Comptroller of the Currency ("Comptroller") closed the subsidiary banks of FRBC and IFRB. The letter ruling was grounded on nine factual assumptions and made seven pertinent rulings. NCNB and the FDIC used the factual predicates set forth in the letter ruling to obtain a tax ruling that no other bidder for the banking subsidiaries was able to procure. The ruling also permitted the FDIC to shift part of the costs for resolving problems with the insured banks (particularly the Dallas Bank) from the FDIC insurance fund onto the U.S. Treasury in general.

NCNB's bid was accepted on July 29, 1988. A bid from FRBC management was rejected in part because it would have permitted creditors of the holding companies to retain some of the value of their investments. The FDIC had predetermined well in advance of July 29, 1988 not to accept any permanent restructuring proposal that involved keeping the subsidiary banks open, because this would impede the FDIC's objective of wiping out holding company creditors. The IRS letter ruling was a significant factor in the FDIC's selection of NCNB on the announced ground that NCNB's proposal represented the least costly alternative.

At the time the FDIC provided assistance to the Dallas and Houston Banks, it knew the banks would not be able to repay the sum of $1 billion. The payment was therefore actually a contribution by the FDIC to the Dallas Bank, not a loan, and was structured as a loan to facilitate the FDIC's attempt to capture the value of unassisted and solvent subsidiary banks of FRBC and IFRB. The FDIC took this approach to offset its ultimate costs in meeting its obligations as insurer of the deposits of the Dallas Bank.

On July 29, 1988 the FDIC accepted NCNB's bid to acquire the voting stock of a newly-established bridge bank that would succeed to the assets of all the subsidiary banks. The FDIC then notified the Comptroller and the Banking Commissioner of Texas that the FDIC would provide no further assistance to the Dallas Bank and would not renew the $1 billion loan when it became due. The Comptroller notified FRB–Dallas that the Dallas Bank was no longer a viable institution. FRB–Dallas then demanded immediate repayment of the Dallas Bank's borrowings. The Dallas Bank could not comply, and the Comptroller then closed the Dallas Bank and appointed the FDIC as its receiver.

The FDIC intended initially to use the guaranty of First RepublicBank Delaware ("Delaware Bank") to force the closure of that bank as in the case of the other subsidiary banks. The Delaware Banking Commissioner (the "Commissioner"), however, precluded this by issuing a cease and desist order that prevented the Delaware Bank from paying assets to anyone, including the FDIC, and directed the bank to institute legal action to obtain a declaration that the guaranty was illegal under Delaware law. Both the Commissioner and the Delaware Bank instigated actions to enjoin the FDIC from attempting to collect any of the bank's assets on the basis of the guaranty or the Agreement.

The Delaware Bank, FRBC, and IFRB took steps to ensure that the solvent Delaware Bank would be able to meet its short-term liquidity needs. Because the bank did not accept retail demand deposits, it had recurrent and typical requirements for such funding to satisfy obligations to merchants. The Delaware Bank had in the past routinely funded a substantial portion of such needs by borrowing from the Texas banking subsidiaries of FRBC and IFRB.

On August 1, 1988 NCNB cut off all short-term funding to the Delaware Bank. In turn, the bank sought funding from the Federal Reserve Bank of Philadelphia ("FRB–Philadelphia"). After consulting with the FDIC, FRB–Philadelphia refused to provide the requested funding. Had the Delaware Bank, FRBC, or IFRB been given reasonable notice of the termination of short-term funding, alternative capital could have been procured on the open market. The next day the Commissioner moved to close the Delaware Bank and petitioned to appoint the FDIC as receiver. The petition alleged the Delaware Bank suffered from liquidity insolvency. This insolvency was manufactured by the FDIC, NCNB, and NCNB Texas National Bank ("NCNB Texas"), the bridge bank that entered into purchase and assumption agreements with the FDIC to assume virtually all the assets and certain liabilities [8] of each of the 41 closed banks. NCNB (as operating manager of NCNB Texas), NCNB Texas, and the FDIC conspired to manufacture the liquidity insolvency.

In its capacity as receiver for each of the 40 closed Texas bank subsidiaries of FRBC and IFRB, the FDIC entered into separate purchase and assumption agreements with NCNB Texas. NCNB Texas acquired all assets of the closed banks, excluding certain causes of action and leased premises, fixtures, and equipment. The bridge bank exchanged in consideration the agreement to assume designated liabilities of each closed bank.

The FDIC will ascertain the ultimate value of the assets of each failed bank and will pay to the receiver the amount, if any, that the FDIC in its corporate capacity realizes over and above the amount necessary to reimburse the FDIC fully for funds provided to NCNB Texas under its bridge bank authority, the FDIC's costs of liquidating the transferred assets, and a reasonable return on the FDIC's expenditures.

The FDIC's reimbursement obligation under the purchase and assumption agreements commingles the liabilities of all 40 Texas banks for reimbursement purposes. So even if a particular bank's assets are ultimately determined to be more valuable than the cost of the liabilities of the bank assumed by NCNB Texas, the bank receivership nevertheless will not be reimbursed so long as the FDIC in its corporate capacity has not been totally reimbursed for all outlays to NCNB Texas, along with the other costs described above. The FDIC agreed to provide operating funds to NCNB Texas sufficient to eliminate any negative equity in a particular subsidiary bank. Due to the deep insolvency of the Dallas Bank, the structure of the reimbursement obligation effectively precludes reimbursement of any of the receiverships.

The purchase and assumption agreement for the Delaware Bank was entered into with a separate bridge bank, Delaware Bridge Bank. The agreement provides that this bridge bank did not assume liabilities for loans made to the Delaware Bank by any other subsidiary bank of FRBC or IFRB except to the extent the loans would have been repaid in the event the Delaware Bank had been liquidated in receivership rather than handled through a purchase and assumption transaction, taking into account any contractual or statutory priorities. The purchase and assumption agree-

---

8. NCNB Texas did not assume subordinated liabilities, liabilities of a failed bank under the Agreement to repay a portion of the $1 billion loan, and certain liabilities for loans made to the bank by any other subsidiary of FRBC or IFRB. NCNB did agree to pay on behalf of the receiver the portion of loans from the subsidi-

ary banks to the Dallas and Houston Banks that would have been paid to the subsidiary banks had the Dallas and Houston Banks been liquidated in receivership rather than handled through a purchase and assumption agreement, taking into account any contractual or statutory priorities.

ment also provides for reimbursement by the FDIC in its corporate capacity ("FDIC–Corporate") to the FDIC as receiver ("FDIC–Receiver") in a manner similar to that pertinent to the Texas bank purchase and assumption agreements. Because the Delaware Bridge Bank succeeded only to the assets and certain obligations of the Delaware Bank, the purchase and assumption agreement does not involve commingling multiple banks' liabilities for reimbursement purposes.

FDIC–Receiver, as receiver of the Delaware Bank, entered into a contract of sale with FDIC–Corporate, pursuant to which FDIC–Receiver purported to transfer to FDIC–Corporate all causes of action the receiver would have relating to any loss incurred by the Delaware Bank. No independent consideration was provided by FDIC–Corporate for the assignment of these causes of action. FDIC–Corporate is required under the purchase and assumption agreement to pay over to the receiver the net proceeds from any cause of action transferred to FDIC–Corporate.

FDIC–Corporate agreed to indemnify the Delaware Bridge Bank and its affiliates and their officers and directors as to claims by any Delaware Bank shareholders, claims arising out of the bank closing, and other liabilities. FDIC–Corporate also en-

tered into an interim agreement with NCNB to manage the Delaware Bridge Bank, agreeing to indemnify NCNB against various liabilities.

FDIC–Corporate sold the credit card operations of the Delaware Bridge Bank to Citicorp, a bank holding company, for a premium of $159 million. The Delaware Bridge Bank retained other assets not acquired by Citicorp. Under the purchase and assumption agreement, the premium and other assets, less the FDIC's operating costs and a reasonable return, must be returned to the Delaware Bank receivership. The FDIC did not conduct the sale of the Delaware Bank's credit card business so as to maximize the sale price, refusing in particular requests by interested bidders to require NCNB not to use the Delaware Bank's customer list for business solicitation purposes if NCNB were not the successful bidder for the Delaware Bank's credit card business.

## II

In count I of their complaint, plaintiffs essentially allege the FDIC acted in contravention of, or exceeded the authority accorded it by, § 2[13](c)(1) of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1823(c)(1), in effecting the $1 billion assistance package.[9] The FDIC moves to

---

9. Plaintiffs specifically contend the FDIC: (1) was not authorized to purchase or encumber the assets or securities of, or otherwise exercise control over, bank holding companies or insured banks other than an assisted bank that meets the statutory criteria for assistance [complaint ¶ 145]; (2) under the guise of assisting one bank, lacked authority to impose obligations, encumbrances, and restrictions on, or purchase the assets or securities of, unassisted affiliated banks [¶ 146]; (3) lacked statutory authority to require the Houston Bank to issue the FDIC a note and to require the Houston Bank to transfer the proceeds of the note to the Dallas Bank [¶ 148]; (4) lacked authority to require the subsidiary banks to guarantee prompt payment of the Notes issued by the Dallas and Houston Banks to the FDIC and to agree that all indebtedness of these banks to the subsidiary banks, including indebtedness resulting from the sale of federal funds, would be subordinated to all other general and subordinated liabilities (except liabilities to other subsidiary banks) of the Dallas and Houston Banks, including the FDIC's subordinated claim on the Notes [¶ 149]; (5)

lacked authority to purchase assets and securities of the subsidiary banks (in the form, *inter alia,* of the guaranties of the Notes and the subordination of the banks' claims for repayment of the Dallas and Houston Banks' indebtedness to them) [*id.*]; (6) lacked statutory authority to require FRBC and IFRB to guarantee prompt payment of the Notes and to treat the guaranties as senior obligations, to require FRBC to pledge the stock of certain of its banks as security for FRBC's guarantee of the notes, and to purchase securities of FRBC and IFRB (in the form, *inter alia,* of the guaranties) [¶ 150]; (7) lacked authority to require FRBC and IFRB to surrender control to the FDIC over themselves and their subsidiary banks by, *inter alia,* permitting the FDIC to oust senior management, require consolidation of banks, control actions of the bank holding companies and their banks (including mergers, sales, acquisitions, and declaration of dividends), and to exercise such control over non-assisted banks and holding companies [¶ 151]; (8) lacked authority to require that subsidiary banks sell all their excess funds to the Dallas and Houston Banks and

dismiss this count, contending, *inter alia,* there is no right of judicial review and that, as a matter of law, the FDIC's conduct was in all respects authorized by § 1823(c).

## A

■ The court must first address the FDIC's contention that judicial review is unavailable because the FDIA confers no private right of action and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.,* affords no right of review (or that plaintiffs lack standing to invoke the APA or cannot recover money damages pursuant thereto).

The question whether judicial review is available in circumstances such as those presented has been infrequently addressed. Every court to consider the issue, however, has implicitly or explicitly found a right of review. Recently, a member of this court rejected arguments apparently similar to the ones now advanced by the FDIC. In *Texas American Bancshares, Inc. v. Clarke,* 740 F.Supp. 1243, 1247–48 (N.D. Tex.), *appeal docketed,* No. 90–1674 (5th Cir.1990), Chief Judge Sanders held the FDIC's structuring of a purchase and assumption transaction pursuant to § 1823(c) to be subject to judicial review where, as here, plaintiffs alleged violations of federal law. Other courts have reached similar conclusions, *see, e.g., First Empire Bank— New York v. FDIC,* 572 F.2d 1361, 1369–71 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), and still others have implicitly assumed the power of judicial review in these circumstances. *See FDIC v. Morley,* 867 F.2d 1381, 1386– 92 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 75, 107 L.Ed.2d 41 (1989); *FDIC v. La Rambla Shopping Center, Inc.,* 791 F.2d 215, 219 (1st Cir.1986); *FDIC v. Main Hurdman,* 655 F.Supp. 259, 268–71 (E.D. Cal.1987). The court discerns no basis to depart from the cases that recognize the FDIC's actions are subject to judicial review.

## B

The court next addresses the question whether the FDIC exceeded the authority conferred upon it by, or violated, § 1823(c).

To ascertain the limits of the FDIC's authority in the context presented, the court must analyze § 1823(c) itself. It is from this statute that the FDIC derives the insured bank assistance powers at issue. Because there is little interpretive precedent, the court determines Congressional intent by examining the language of the statute. "Where this court is unfettered by a higher court's interpretation of a statute, it seeks to determine the intent of Congress from the statutory language that the legislative branch employed. It is the intent of Congress—not the choice of a judge—that must control." *Driggs v. United States,* 706 F.Supp. 20, 21 (N.D. Tex.1989).

■ Section 1823(c)(1) provides: [10]

to subordinate the subsidiary banks' claims for repayment of those funds to the claims of the general and subordinated creditors of the Dallas and Houston Banks [¶ 152]; (9) unlawfully required the transfer of subsidiary bank assets to the Dallas and Houston Banks to the FDIC's benefit since the two banks were not permitted to repay their indebtedness to the subsidiary banks in the ordinary course of business and the other banks were required to continue to supply funds to the Dallas and Houston Banks at the FDIC's direction [¶ 153]; (10) unlawfully undertook actions designed to, and which did, destabilize unassisted and previously stable banks for self-serving purposes [¶ 154]; (11) erroneously and falsely represented that it had the legal power and authority to enter into the Agreement and that consummation of the transactions would not violate federal law [¶ 155]; and (12) breached its duty under federal and

state law to pursue each of the banks' claims to restitution of assets that were transferred pursuant to wrongful and/or void agreements by purporting to have sold each of the banks' causes of action to FDIC–Corporate, even though the FDIC in its corporate capacity was the primary beneficiary of the transfers [¶ 159].

**10.** Section 1823(c)(1) has been retained, but modified, by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 1989 U.S.Code Cong. & Admin.News (103 Stat.) 183 ("FIRREA"). Neither plaintiffs nor the FDIC contends FIRREA bears on the FDIC's motion as it pertains to count I and the court has applied pre-FIRREA law in deciding whether count I states a claim. For editorial clarity the court refers in the present tense to the former version of § 1823(c)(1) that applies to the present case.

The [FDIC] is authorized, in its sole discretion and upon such terms and conditions as the Board of Directors may prescribe, to make loans to, to make deposits in, to purchase the assets or securities of, to assume the liabilities of, or to make contributions to, any insured bank—

(A) if such action is taken to prevent the closing of such insured bank;

(B) if, with respect to a closed insured bank, such action is taken to restore such closed insured bank to normal operation; or

(C) if, when severe financial conditions exist which threaten the stability of a significant number of insured banks or of insured banks possessing significant financial resources, such action is taken in order to lessen the risk to the [FDIC] posed by such insured bank under such threat of instability.

In this statute Congress has conferred upon the FDIC the authority to provide assistance to an insured bank to accomplish three different purposes: prevent the closing of an insured bank, restore a closed insured bank to normal operation, and lessen the risk to the FDIC posed by an insured bank. *Id.* The FDIA empowers the FDIC to make loans to and deposits in, purchase the assets or securities of, assume the liabilities of, or make contributions to, any insured bank upon such terms and conditions as the FDIC Board of Directors may prescribe and in its sole discretion. *Id.*[11]

Plaintiffs urge the court to read § 1823(c)(1) narrowly, contending Congress did not confer virtually limitless discretion upon the FDIC to structure assistance transactions and did not authorize the FDIC to act with the intent to destabilize, trigger the demise of, and capture the assets of, otherwise solvent banks. Plaintiffs argue the legislative history for § 1823(c)(1) demonstrates the statute "was not to be used to keep a troubled bank open only long enough to allow the FDIC to orchestrate the appropriation of the value of its solvent affiliates." Ps.Br.Opp.Mot. Dis. at 17. They posit that the "terms and conditions" clause of § 1823(c)(1) empowers the FDIC Board of Directors only to prescribe assistance terms designed to keep a troubled bank open or return it to normal operation, *id.* at 25, and should be understood to apply only to "terms" such as loan duration and interest rate, and "conditions" such as requiring management to take certain actions to ensure a bank's viability. *Id.* at 26.[12] The court declines to adopt plaintiffs' cramped interpretation of the powers conferred by § 1823(c)(1).

Taken as true, the component allegations of count I of plaintiffs' complaint essentially collapse into these two underlying theories: first, the FDIC lacked authority to require performance by, and control the activities of, bank holding companies or insured banks other than the Dallas Bank as conditions for aiding that bank; and, second, the FDIC violated § 1823(c)(1) by undertaking some or all of the actions in question under the guise of assisting the Dallas Bank, but with the "self-serving" intent of destabilizing unassisted and previously solvent banks in order to permit the FDIC to appropriate bank assets that it could not otherwise have lawfully captured.

Subject to qualifying conditions set out in the FDIA,[13] the FDIC is authorized by

---

**11.** The FDIC must comply with § 1823(c)(4)(A) (assistance shall not be provided in an amount in excess of that which the FDIC determines to be reasonably necessary to save the cost of liquidating an insured bank unless the FDIC determines that continued operation of the bank is essential to provide adequate banking services in the community) and § 1823(c)(4)(B) (FDIC may not purchase the voting or common stock of an insured bank).

**12.** Plaintiffs also contend Rule 12(b)(6) dismissal is inappropriate because the FDIC relies upon disputed facts to warrant relief. The court agrees that the FDIC impermissibly bases several of its arguments on its own version of the facts. *E.g.*, FDIC Br.Supp.Mot.Dis. at 12–13, 14–15. The court's ruling does not run afoul of Rule 12(b)(6), however, because it assumes the truth of the allegations of plaintiffs' complaint and, so doing, determines the FDIC is entitled to dismissal in part of count I.

**13.** Sections 1823(c)(1)(C), (c)(4)(A), and (c)(4)(B) qualify the FDIC's authority. The complaint does not state a claim for a violation of any of these provisions.

§ 1823(c)(1) to extend assistance to an insured bank by making loans to and deposits in, purchasing the assets or securities or assuming the liabilities of, or making contributions to, any insured bank if the action is taken to prevent the closing of an insured bank or, when severe financial conditions exist which threaten the stability of a significant number of insured banks or of insured banks possessing significant financial resources, the action is taken to lessen the risk to the FDIC posed by the insured bank. When the FDIC renders such aid it does so in its "sole discretion" and "upon such terms and conditions as the [FDIC] Board of Directors may prescribe." 12 U.S.C. § 1823(c)(1).

■ The authority Congress vested in the FDIC pursuant to the FDIA is intentionally broad. The FDIC was created in 1933 in response to the Great Depression to "preserve solvency of insured banks and thus to keep open the channels of trade and commercial exchange." *Zinman v. FDIC,* 567 F.Supp. 243, 247 (E.D.Pa.1983) (quoting *Weir v. United States,* 92 F.2d 634, 636 (7th Cir.), *cert. denied,* 302 U.S. 761, 58 S.Ct. 368, 82 L.Ed. 590 (1937)). FDIC "assistance must be tailored to the unique circumstances of the endangered bank," notwithstanding the absence of express language granting the FDIC a particular power, *Zinman,* 567 F.Supp. at 247, and the FDIC's actions must be taken promptly to "avoid bank failure and the resulting disruption to the financial community." *Id.* The "expansive" regulatory purposes of the FDIA and "broad language" of § 1823(c) lead to the conclusion "that Congress intended 12 U.S.C. 1823(c) to be construed liberally to effectuate the purposes of the [FDIA] and achieve stability in the banking community for sake of the nation's economy." *Id.* The FDIC's authority to provide assistance on the "terms and conditions" it chooses is to be read liberally to confer upon the FDIC necessary latitude and flexibility to fulfill its vital statutory mission. *See id.* The statute intentionally frees the FDIC from after-the-fact flyspecking of often rapid and difficult decisions.

■ Applying § 1823(c)(1) to the component allegations of count I that allege the FDIC's conduct in various respects was unauthorized, *see supra* note 9, and assuming these factual allegations to be true, the court concludes the complaint fails to state a claim. The FDIC's actions in conditioning the $1 billion assistance package in the manner alleged were fully authorized pursuant to the FDIC's power to act in its sole discretion and upon the terms and conditions that its Board of Directors dictates. This court will not read into the words that Congress employed in § 1823(c)(1), restrictions on the FDIC's power that are neither stated in nor implied by the statutory text.

■ The second underlying theory of the allegations of count I is that the FDIC undertook some or all the actions in question under the guise of assisting the Dallas Bank, but with the self-serving intent of

In a March 16, 1988 resolution of its Board of Directors, the FDIC determined that "severe financial conditions exist which threaten the stability of a significant number of insured banks in Texas, including the [Dallas and Houston] Banks, and the assistance will lessen the risk to the FDIC posed by the [Dallas and Houston] Banks." FDIC App. to Br.Supp.Mot.Dis. at 62. This finding complies with the literal requirements of § 1823(c)(1)(C). In their briefing, plaintiffs appear to challenge the finding only insofar as it pertains to the subsidiary banks that guarantied the $1 billion assistance package, contending most or all these banks were solvent. Because the court holds the FDIC's § 1823(c)(1) power reaches broadly enough to permit obligating unassisted banks when a § 1823(c)(1)(C) finding can be justified as to one bank, plaintiffs' contention regarding the

other banks is immaterial. The court accordingly concludes the FDIC complied with § 1823(c)(1)(C).

The FDIC's resolution does not contain a finding that the assistance package conformed with the cost test of § 1823(c)(4)(A). *See supra* note 11. Plaintiffs challenge this omission only insofar as it pertains to the subsidiary banks, *see* Ps.Br.Opp.Mot.Dis. at 24–25 n. 9, and there exists no reasonable basis in the complaint to conclude the requirements of § 1823(c)(4)(A) were not met as to the Dallas Bank. Because the court holds the status of the Dallas Bank authorized the FDIC to condition assistance on the obligations of the subsidiary banks, the lack of a finding regarding those banks is irrelevant.

Plaintiffs do not contend the FDIC ran afoul of § 1823(c)(4)(B)'s restriction against purchasing voting or common bank stock.

destabilizing unassisted solvent banks so as to appropriate bank assets the FDIC could not otherwise have lawfully reached.

It is clear the FDIC may act in its self-interest when severe financial conditions exist of the type specified in § 1823(c)(1)(C). To suggest the FDIC somehow runs afoul of its § 1823(c)(1) authority when its motive is not to keep a bank open misreads the disjunctive language of the statute. Section 1823(c)(1) does refer in subsection (A) to taking action to prevent the closing of an insured bank. Subsection (C) is a separate grant of power, however. It permits the FDIC to act "to lessen the risk to the [FDIC]" rather than, as required by subsection (A), "to prevent the closing of [an] insured bank." Therefore, assuming the animus for the FDIC's actions was indeed "self-serving," as plaintiffs allege, this fact is alone immaterial.

It is also pellucid, under the court's prior holding, that the FDIC can lawfully capture a solvent bank's assets pursuant to its broad authority to render assistance to an insured bank, or to lessen the risk to the FDIC, on terms and conditions that it prescribes in its sole discretion.

The dispositive question, therefore, is whether the FDIC may engage in conduct intended to destabilize unassisted and previously solvent banks. The court cannot dismiss this part of count I on the present pleadings.

Rule 12(b)(6) does not permit a court to dismiss a claim at the pleading stage unless it appears beyond doubt that the plaintiffs can prove no facts in support of their complaint that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). As this aspect of count I is presently framed, it is conceivable plaintiffs are alleging the FDIC acted with no legitimate regulatory purpose, that is, without a *bona fide* intent to lessen the risk to the FDIC or to assist an open insured bank. The complaint appears to contend the FDIC instead engaged in the transaction with the intent to injure

insured banks, bank holding companies, and their creditors and owners. This is suggested by allegations, among others, that the FDIC structured the assistance package for the purpose of wiping out holding company creditors, complaint at ¶ 94, conspired with NCNB to manufacture a liquidity insolvency at the Delaware Bank, *id.* at ¶ 120, and imposed obligations, encumbrances, and restrictions on the subsidiary banks "under the guise" of assisting the Dallas Bank, *id.* at ¶ 146. It may also be inferred from the contention that the FDIC kept the Dallas Bank open to allow it to appropriate the value of solvent affiliates. Ps.Br.Opp.Mot.Dis. at 17; *see* complaint ¶ 60. The court cannot say at this preliminary stage that the FDIC is entitled to dismissal of an allegation that it acted for a purpose not permitted by Congress in § 1823(c)(1)(A)–(C).[14]

The court dismisses in part count I of the complaint.

### III

Plaintiffs allege in count II that the transfer of the $200 million note from the Houston Bank to the Dallas Bank, as well as the guaranties given by the subsidiary banks, were transfers in contemplation of insolvency and as such are void under the National Bank Act ("NBA"), 12 U.S.C. § 21 *et seq.* Count II also challenges the subordination of debt and alleges violations of Texas and Delaware law. Count III alleges that requiring the subsidiary banks to act as guarantors violated the NBA, § 23A of the Federal Reserve Act, 12 U.S.C. § 371c, and various provisions of Texas law. Count VIII contends parts of the Agreement are void as fraudulent transfers under §§ 544 and 548 of the Bankruptcy Code. Counts IX and X make similar allegations.

The FDIC argues plaintiffs' claims based on general provisions of federal and state law must be dismissed. According to the FDIC, its authority and discretion to structure assistance to requesting banks is gov-

---

**14.** The court does not intimate that such a claim would survive a summary judgment motion, where a different legal standard applies. Nor does the court predetermine the claim would not withstand summary judgment scrutiny.

erned exclusively by § 1823(c). The FDIC asks the court to construe the statute so as to allow it to "operate ... unfettered by general statutory provisions intended to govern private sector transactions between debtors and creditors." FDIC Br.Supp. Mot.Dis. at 31. The FDIC contends the general provisions of state law that conflict with the FDIC's broad discretionary authority under § 1823(c) are displaced, and that plaintiffs have failed to state a valid claim under any applicable provisions of federal or state law.

### A

■ In considering whether § 1823(c) governs exclusively the terms of the FDIC's assistance to the FRBC banks, the court is guided by the Fifth Circuit's recent decision in *MCorp Financial, Inc. v. Board of Governors Federal Reserve System,* 900 F.2d 852 (5th Cir.1990). In *MCorp* the Fifth Circuit rejected the argument that 28 U.S.C. § 1334(b), the jurisdictional provision relating to bankruptcy matters, operates to displace the jurisdiction provided the Board of Governors by 12 U.S.C. § 1818(i). *MCorp,* 900 F.2d at 855–56. The circuit court reasoned that "[i]n holding that § 1334 superseded § 1818(i), the district court did not harmonize the two statutes, but effectively repealed § 1818(i), and negated its basic sense and purpose." *Id.* at 855. The court explained that "[i]mplied repeals are highly disfavored, and one statute will not be considered to impliedly repeal another unless there is a 'positive repugnancy' between the two." *Id.* at 855–56 (citing *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978)). Finding no irreconcilable conflict, the court reversed the district court's ruling that § 1334(b) displaced § 1818(i). *Id.* at· 855–57.

The FDIC argues in the present case that it does not contend § 1823(c) repeals provisions of the NBA or Bankruptcy Code, but only that the specific grant of authority given in § 1823(c) must govern over the general provisions of the other statutes. The FDIC asserts the exercise of its authority under § 1823(c) is not compatible with other provisions of ·federal law that may operate to constrain that authority. It requests the court to harmonize § 1823(c) with the other federal provisions in a manner that allows § 1823(c) to operate fully.

Notwithstanding the contentions to the contrary, in order to hold the FDIC's conduct to be governed solely by § 1823(c) the court must do exactly what *MCorp* prohibits: impliedly repeal other provisions of federal law. The FDIC has neither identified authority to support such a broad proposition nor explained the "irreconcilable conflict" [15] between the statutes. Moreover, the general notion that a specific statute will not be controlled by a general one, *see, e.g., MCorp,* 900 F.2d at 856–57, has no application where, as here, the federal provisions at issue are specific and may be implicated by the acts that have occurred. The court accordingly holds the broad authority granted by § 1823(c) does not relieve the FDIC from obligations imposed by other provisions of federal law, and declines to dismiss plaintiffs' claims on that basis.

### B

■ Having concluded § 1823(c) does not relieve the FDIC of other requirements of federal law, the court next considers whether the statute displaces contrary provisions of state law.

Federal law operates to preempt state law in instances of clear statutory prescription or where there exists a direct conflict between federal and state law. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 2513–14, 101 L.Ed.2d 442 (1988) (citations omitted). There also exist certain areas involving "uniquely federal interests" that are so committed to

---

**15.** It is true, of course, that the FDIC's actions taken pursuant to § 1823(c) may implicate certain other provisions of federal law. Section 1823(c), however, cannot be read to sanitize every action taken by the FDIC in implementing

an assistance transaction. If the rule were otherwise, the FDIC would arguably have *carte blanche* to impose even unlawful conditions on the basis of the expansive authority granted by § 1823(c).

federal control that "state law is preempted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'" *Id.* at 2514 (citations omitted). The Supreme Court, and other courts, have repeatedly held that the rights and obligations of the FDIC relating to its role as guardian of the deposit insurance fund and as receiver for failed institutions is an area of uniquely federal interest. *See, e.g., D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 457–58, 62 S.Ct. 676, 679–80, 86 L.Ed. 956 (1942) (federal policy protects FDIC and deposit fund from unrecorded agreements); *NCNB Tex. Nat'l Bank v. Cowden,* 895 F.2d 1488, 1494–1501 (5th Cir.1990) (Texas Trust Code preempted by provisions of FDIA); *Gunter v. Hutcheson,* 674 F.2d 862, 869 (11th Cir.) (federal law controls rights and obligations of the FDIC), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *FDIC v. Lattimore Land Corp.,* 656 F.2d 139, 143 n. 6 (5th Cir. Unit B 1981) (same).

The court concludes that subjecting the FDIC to potentially inconsistent provisions of state law would impede the FDIC's mandate and ability to carry out its duties under § 1823(c). When faced with the potential collapse of a federally-insured institution, the FDIC must have the considerable flexibility afforded it by § 1823(c) to fashion a solution. Although the Nation operates with a dual banking system, the FDIC shoulders the principal burden of responding to the financial difficulties of virtually all commercial banks. The legality of the FDIC's response should be judged solely by reference to uniform federal laws rather than by a potentially diverse network of state regulations.

Accordingly, the court holds the FDIA preempts state law to the extent pertinent

here and dismisses plaintiffs' state law claims.

### C

The court next considers whether plaintiffs have pleaded valid claims under the applicable provisions of federal law.

■ The FDIC first contends count II should be dismissed because § 91 of the NBA, 12 U.S.C. § 91,[16] does not reach the type of transactions set forth in the Agreement. In considering this contention, the court must adhere to the policies underlying the NBA, most importantly that of "achieving the 'equity of equality among creditors.'" *Downriver Community Fed. Credit Union v. Penn Square Bank,* 879 F.2d 754, 761 (10th Cir.1989) (quoting *Scott v. Armstrong,* 146 U.S. 499, 511, 13 S.Ct. 148, 152, 36 L.Ed. 1059 (1892)), *cert. denied,* —— U.S. ——, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990). The court is nonetheless restricted to the terms Congress has utilized in the statute, and may not extend those terms to encompass transactions not thereby contemplated.

Plaintiffs allege § 91 was violated when the Houston Bank agreed to, and did, transfer value to the FDIC in the form of the $200 million note; the subsidiary banks issued guaranties of the $1 billion loan and subordinations of the Dallas and Houston Banks' indebtedness to them; and the subsidiary banks transferred assets to the Dallas and Houston Banks in the form of federal funds sales after entering into the Agreement. Plaintiffs allege each of these actions was undertaken in contemplation of insolvency.

It is questionable whether the issuance of a guarantee or an agreement to subordinate a debt falls within the prohibitions of § 91. Plaintiffs assert that "[c]ourts have long held that § 91 bars a national

---

**16.** 12 U.S.C. § 91 provides, in part:
 All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or credi-

tors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in a manner prescribed by this chapter, or with a view to the preference of one creditor to another ... shall be utterly null and void.

bank from transferring any valuable thing, including a guarantee or other security, in contemplation of insolvency." Ps.Br.Opp. Mot.Dis. at 46. But the court has located no cases that address the specific issues presented here and the literal terms of § 91 do not lend themselves to the result plaintiffs seek. Nonetheless, a transfer of federal funds in contemplation of insolvency does fall within § 91's proscription against the transfer of "payments of money to [creditors] ... made after the commission of an act of insolvency." While it may ultimately be determined that the transfer of federal funds was not made in contemplation of insolvency, the court is not free to reach a factual conclusion contrary to the allegations of the complaint. The court declines to dismiss count II.

■ The FDIC next contends count III should be dismissed because the limited guaranties issued by the subsidiary banks constituted a "safe and sound" banking practice within the meaning of the Federal Reserve Act, 12 U.S.C. § 371c(a)(4).[17] The FDIC does not question the general rule that national banks are not authorized to enter into guaranties, see, e.g., *First Empire*, 572 F.2d at 1367; *American Ins. Ass'n v. Clarke*, 656 F.Supp. 404, 411 (D.D. C.1987), aff'd, 865 F.2d 278 (D.C.Cir.1988), but instead relies solely on its "safe and sound" contention. The court need only note that this proposition rests on sharply disputed facts. The court cannot resolve the merits of count III at this stage of the proceedings. The court reaches the same result with respect to plaintiffs' claims under §§ 544 and 548 of the Bankruptcy Code.[18]

The FDIC finally contends the complaint must be dismissed because the FDIC is protected by sovereign immunity or, alter- natively, because there exists no private right of action under the substantive statutes on which plaintiffs rely. The court rejects each argument.

■ 11 U.S.C. § 106(a)[19] waives immunity of a governmental unit as to any compulsory counterclaim asserted in a bankruptcy proceeding where the unit has filed proofs of claim. See, e.g., *In re Willington Convalescent Home, Inc.*, 850 F.2d 50, 54 (2d Cir.1988), aff'd sub nom. *Hoffman v. Connecticut Dep't of Income Maintenance*, —— U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989); *In re Lile*, 96 B.R. 81, 83–85 (Bankr.S.D.Tex.), modified, 103 B.R. 830 (1989). Sovereign immunity is accordingly relinquished under § 106(a) when: (1) the bankrupt estate and the governmental unit each has a claim against the other; (2) the claim against the governmental unit is the property of the estate; and (3) the claims arise out of the same transaction or occurrence. *Lile*, 96 B.R. at 84 (citing *In re Davis*, 20 B.R. 519 (Bankr.M.D.Ga. 1982)). The waiver of immunity prohibits a governmental entity from seeking a distribution from a bankrupt estate while at the same time seeking to shield itself from all liability. See *Lile*, 96 B.R. at 84.

The FDIC does not contest the existence of the § 106(a) requirements, but asserts on the basis of *Williamson v. United States Dep't of Agric.*, 815 F.2d 368 (5th Cir.1987), that "the Federal Tort Claims Act applies in bankruptcy proceedings." FDIC Rep.Br.Supp.Mot.Dis. at 20 n. 17. The Fifth Circuit's decision in *Williamson* contains no discussion of § 106(a) and provides no basis for concluding the settled waiver rule embodied in § 106(a) is inapplicable. Section 106(a) provides a limited relinquishment of sovereign immunity when a governmental unit files a claim

---

**17.** 12 U.S.C. § 371c(a)(4):

Any covered transactions and any transactions exempt under subsection (d) of this section between a member bank and an affiliate shall be on terms and conditions that are consistent with safe and sound banking practices.

**18.** The court expresses no opinion on the ultimate resolution of the fraudulent transfer counts. This issue is more fully presented in other matters now pending before the court and will be considered there.

**19.** 11 U.S.C. § 106(a):

A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

against a bankrupt estate. *See Hoffman,* 109 S.Ct. at 2822. It is undisputed that the FDIC has filed such a claim in this case. The court accordingly concludes § 106(a) is applicable and holds the FDIC has waived sovereign immunity in the context presented.

Regarding the existence of a private right of action, the FDIC has presented no basis to avoid the litany of cases that have found the FDIC's actions subject to review under the NBA and other federal banking statutes. *See, e.g., First Empire,* 572 F.2d at 1369–71; *cf. MCorp,* 900 F.2d at 858–59 (reviewing actions of Board of Governors Federal Reserve System under Federal Reserve Act). The court declines to dismiss plaintiffs' claims on this basis.

## IV

■ The FDIC also moves to dismiss plaintiffs' complaint in its entirety on the basis of these three estoppel theories: First, FRBC, IFRB, and their subsidiary banks made representations and entered into the Agreement to obtain assistance and relief from a federal agency and plaintiffs may not now disavow the representations and agreement. Second, plaintiffs may not attack the validity of a contract if they have accepted the benefits of the contract. Third, plaintiffs may not contradict concessions in other lawsuits that the

transaction was legal and are thus individually estopped from challenging the validity of the FDIC's assistance in this case.

The FDIC's estoppel theories may be viable—a question the court does not reach—but they are not appropriately considered at this procedural stage. As the court notes above, Rule 12(b)(6) dismissal is inappropriate unless the court concludes beyond doubt that plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. The court is to accept the allegations of plaintiffs' complaint as true and to draw all inferences in favor of plaintiffs. The FDIC's first two estoppel arguments rely upon matters that are outside the complaint and are not properly considered on Rule 12(b)(6) motion.[20] The FDIC raised its third argument for the first time in its reply brief[21] and the court will not consider it in deciding the motion to dismiss.

## V

Plaintiffs allege in count IV that the purchase and assumption agreements entered into between the FDIC and the subsidiary banks discriminate between unsecured non-subordinated creditors within the same class and thus violate the ratable distribution requirements of 12 U.S.C. § 194.[22] According to plaintiffs, the pur-

---

**20.** In its reply brief the FDIC urges that certain matters outside the pleadings (i.e., matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint) may also be taken into account in deciding a Rule 12(b)(6) motion. The authorities on which the FDIC relies for this proposition support the FDIC, but they are not controlling Fifth Circuit precedent. Although this circuit has permitted some reliance on matters outside the complaint, *see Mahone v. Addicks Utility Dist.,* 836 F.2d 921, 935–36 (5th Cir.1988) (circuit court could go beyond pleadings to hypothesize what legitimate purpose utility district had in creating classifications challenged as violative of Equal Protection Clause where district's action would be upheld if supported by any conceivable factual basis), it generally adheres to the restrictive rule that a Rule 12(b)(6) motion to dismiss is to be evaluated only on the pleadings. *Jackson v. Procunier,* 789 F.2d 307, 309 (5th Cir.1986); *O'Quinn v. Manuel,* 773 F.2d 605, 608 (5th Cir.1985) (court cannot look outside the pleadings). Accordingly, the court declines to consider the materials necessary to

support the FDIC's estoppel argument on the ground that they are outside the complaint.

**21.** In its opening brief the FDIC states that plaintiffs' allegations in this suit "flatly contradict positions taken" in other litigation. FDIC Br.Supp.Mot.Dis. at 12 n. 5. The FDIC did not urge this or cite to this portion of its brief in connection with the estoppel argument. *Cf. id.* at 39–43.

**22.** 12 U.S.C. § 194:

From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remain-

chase and assumption agreements were defective because they provided for full payment of some creditors' claims but not others. The FDIC responds that each of its actions was authorized by the bridge bank authority granted it in 12 U.S.C. § 1821(i) (Supp.1988), and additionally contends § 212 of the recently-enacted Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 1989 U.S.Code Cong. & Admin.News (103 Stat.) 183 ("FIRREA"), establishes the purchase and assumption agreements treated all creditors lawfully.

### A

 The court must first address the applicability of FIRREA § 212(a), 12 U.S.C. § 1821(i)(2).

With the enactment of § 1821(i)(2), Congress repealed former § 2[11](d) of the FDIA, which subjected the FDIC to the ratable distribution requirements of the NBA, and thereby effectively overruled prior inconsistent judicial decisions. *See, e.g., Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538, 541–42 (9th Cir.1987); *First Empire,* 572 F.2d at 1369–71. *See also MBank New Braunfels, N.A. v. FDIC,* 721 F.Supp. 120, 123–25 (N.D.Tex.1989) (Porter, C.J.). As amended by FIRREA, § 1821(i)(2) [23] limits the FDIC's maximum liability to any person having a claim against the receiver or the failed institution for which the FDIC is acting as receiver to the amount the person would have received in a straight liquidation. *Village South Joint Venture v. FDIC,* 733 F.Supp. 50, 51 (N.D.Tex.1990). Thus, if § 1821(i)(2) is applicable to this case, plaintiffs are entitled only to the liquidation value of their claims, regardless whether other creditors may have received payment in full.

Plaintiffs contend § 1821(i)(2) is inapplicable because FIRREA was enacted subsequent to the events in question here. They rely on the "general rule [that] legislation must be applied prospectively" absent clear legislative intent to the contrary, *see Griffon v. United States Dep't of Health and Human Servs.,* 802 F.2d 146, 152 (5th Cir. 1986), and reason that § 1821(i)(2) cannot be applied retroactively. The FDIC responds that FIRREA and § 1821(i)(2) represent only a clarification of existing law and thus can be applied without considering their retroactivity. The FDIC contends in the alternative that *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), dictates § 1821(i)(2) should apply as the law in effect at the time of this court's decision.

In *Texas American Bancshares* Chief Judge Sanders rejected the FDIC's contention that § 1821(j) should apply retroactively, holding that statutes affecting substantive rights and liabilities are presumed to have only prospective effect unless Congress indicates otherwise, and that no clear Congressional intent to that effect is present in the case of § 1821(j). 740 F.Supp. at 1248. The court finds no basis to depart from this analysis in the context of § 1821(i)(2).

The court recognizes the tension between the *Bradley* line of cases, which gives retroactive effect to newly enacted legislation, and the settled principle that statutes should be applied prospectively. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno,* ——— U.S. ———, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990). Until the Supreme Court clarifies the jurisprudence in this area, the court remains guided by the Fifth Circuit's *Griffon* teaching that legislation is to be applied "prospectively absent unequivocal Congressional intent." 802 F.2d at 155. With respect to the FDIC and its authority to deal with the creditors of

---

der of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held.

**23.** 12 U.S.C. § 1821(i)(2), as amended by FIRREA, provides:

The maximum liability of the [FDIC], acting as receiver or in any other capacity, to any

person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the [FDIC] had liquidated the assets and liabilities of such institution without exercising the [FDIC's] authority under subsection (n) of this section or section 1823 of this title.

failed banks, § 1821(i)(2) operates to displace existing interpretations of the NBA. Section 1821(i)(2) should not be applied retroactively in this case.[24]

### B

■ Having concluded § 1821(i)(2) does not apply, the question presented is whether count IV of plaintiffs' complaint states a valid claim under the NBA.

Plaintiffs allege the provisions of the Agreement that purport to subordinate the indebtedness owed to the subsidiary banks by the Dallas Bank are void as contravening federal law. This indebtedness arose from the sale of federal funds by the subsidiary banks to the Dallas Bank and approximated $4.2 billion dollars as of July 28, 1988. The Agreement subordinated this debt to other unsecured obligations.[25] When the Dallas Bank and the subsidiary banks were declared insolvent, the FDIC entered into the purchase and assumption agreements with NCNB. Pursuant to these agreements, the FDIC transferred to NCNB all deposit liabilities and liabilities to outside creditors. NCNB did not assume liability for intra-system loans. The net effect was that depositors and general outside creditors received 100% payment on their claims, while intrabank creditors were left to pursue their claims against receiverships with insufficient assets to pay the claims.

Plaintiffs contend that, because the purchase and assumption agreements make greater distributions to some creditors than to others and do not leave sufficient assets in the receiverships to provide full payment to the intrabank creditors, the agreements are void as fraudulent transfers under 12 U.S.C. § 91 and violate the ratable distribution requirements of 12 U.S.C. § 194.

Plaintiffs seek to recover 100 cents on the dollar for their claims, a recovery that would require the FDIC to infuse the FRBC receiverships with $500 to $800 million from the deposit insurance fund.[26] Plaintiffs urge that this result is mandated by the construction given the NBA pursuant to the so-called *First Empire* doctrine, which has subsequently been followed by judges of this court in *MBank New Braunfels* and *Texas American Bancshares.*

Section 91 prohibits the transfer of assets after the commission of an act of insolvency made "with a view to the preference of one creditor to another." Section 194 provides in part that "the comptroller shall make a ratable dividend of the money so paid over to him by the receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction." These statutory provisions were originally enacted in 1866 as part of the NBA. Early decisions construing these laws arose in the context of bank liquidations and characterized the purpose of the requirements as ensuring equality of treatment among creditors in the distribution of assets of a failed bank. *See, e.g., Scott,* 146 U.S. at 509–10, 13 S.Ct. at 151; *White v. Knox,* 111 U.S. 784, 786, 4 S.Ct. 686, 686, 28 L.Ed. 603 (1884); *National Bank v. Colby,* 88 U.S. 609, 613, 22 L.Ed. 687 (1874). In *Knox* the Supreme Court explained that

> [d]ividends are to be paid to all creditors ratably, that is to say, proportionally. To be proportionate they must be made by some uniform rule. They are to be paid on all claims against the bank previously proved or adjudicated. All creditors are to be treated alike.

111 U.S. at 786, 4 S.Ct. at 686–87. The Court applied this equal treatment policy in

---

**24.** The court's holding today casts no shadow on its previous rulings that § 1821(i)(2) *does* apply retroactively in the case of thrift institutions placed in receivership prior to the enactment of FIRREA. Unlike the FDIC, the Federal Savings and Loan Insurance Corporation ("FSLIC") was never subject to the ratable distribution requirements of the NBA. The FSLIC could, and indeed was obligated to, discriminate among creditors in distributing receivership assets by following the depositor preference statute set forth in federal regulations. FIRREA simply codified this result with respect to thrifts, and did no more than preserve the status quo. *See Triland Inv. Group v. FDIC,* 735 F.Supp. 698, 700–01 (N.D.Tex.1990).

**25.** The FDIC contends it has not and will not enforce the subordination agreement.

**26.** This amount represents the equity position of the banks.

rejecting the contention of a creditor who had been forced to litigate his allegation that he was entitled to recover the face amount of his claim plus costs of litigation. *Id.* at 786–88, 4 S.Ct. at 686–87.

Cases of the modern era dealing with bank failures and ratable distribution requirements do not stand on equal contextual footing with *Knox.* The most obvious difference is that bank failures today do not necessarily result in a liquidation and corresponding distribution of a bank's assets. They are often handled instead by purchase and assumption transactions. This method of dealing with bank failures essentially involves the transfer of a failed bank's assets and certain of its liabilities to a solvent acquiring institution, which receives financial assistance from the FDIC as part of the transaction. *See generally Gunter,* 674 F.2d at 865, 866. The method is viewed as preferable, and is employed wherever feasible, because it can be effected by the FDIC while avoiding "the significant problems with liquidation." *Id.* at 865. Where, as here, the acquiring bank assumes some but not all of the failed bank's liabilities, the unassumed creditors receive less on their claims than do the assumed creditors.

The question presented by the motion to dismiss is whether the assumption and full payment of certain liabilities by an acquiring bank violates the rights vested by §§ 91 and 194 in creditors whose liabilities are not assumed.

Much of the jurisprudence on this question derives from decisions of the Ninth Circuit. In *First Empire* the court held that a purchase and assumption agreement which provided 100% payment to assumed creditors but lesser payment to unassumed creditors violated the provisions of §§ 91 and 194. 572 F.2d at 1371. The panel concluded that when a purchase and assumption agreement provides for payment in full to some creditors, but leaves other creditors only with claims against a receivership unable to satisfy those claims in full, the FDIC must "stand ready to make the distribution ratable—to supplement the remaining assets should they fall short and

to surrender its lien when necessary." *Id.* Similarly, in *FDIC v. United States Nat'l Bank,* 685 F.2d 270, 273–77 (9th Cir.1982), the court reaffirmed its holding in *First Empire,* concluding that a defrauded subordinated noteholder was entitled to receive a ratable distribution from assets transferred in a purchase and assumption transaction. Finally, in *Woodbridge Plaza,* 815 F.2d at 544, the court applied *First Empire* to California law and held that, in arranging a purchase and assumption transaction, the FDIC-receiver cannot "arbitrarily ... exclude creditors of a closed bank from the distribution of assets."

Two judges of this court have had occasion to litigate questions involving the *First Empire* doctrine. In *MBank New Braunfels* Chief Judge Porter suggested in *dictum* that the FDIC violated §§ 91 and 194 by engaging in a purchase and assumption transaction that provided for the assumption by the acquiring bank of all federal fund liabilities of the failed bank except those owed by the failed bank to its parent holding company or any of its affiliate banks. 721 F.Supp. at 123–24. Relying on *Knox* and *First Empire,* Judge Porter concluded the FDIC could not pay one group of unsecured creditors 100% on their claims and a different group a lesser percentage. *Id.* at 124.

In *Texas American Bancshares* Chief Judge Sanders held the FDIC violated §§ 91 and 194 by providing for 100% payment of some claims but a lesser percentage of others. 740 F.Supp. 1252–53. He rejected the FDIC's contention that the unassumed creditors were entitled to no more than a ratable distribution of the liquidation value of the failed bank's assets, noting that "[n]owhere does the NBA refer to the value upon liquidation as the maximum amount any one claimant may receive." *Id.* at 1253. He determined that "[p]laintiffs are entitled to equal treatment with the assumed creditors." *Id.* at 1254.

For reasons that need not be discussed today, the court sees considerable force in the FDIC's argument that the ratable distribution requirement of § 194 applies differently to purchase and assumption trans-

actions,[27] requiring only the ratable distribution of the value of the failed bank's assets as if it had been liquidated. Nevertheless, the court declines to dismiss count IV at this preliminary stage.

Two judges of this court have already determined the *First Empire* doctrine is sound and one panel of the Fifth Circuit was satisfied, at least at one time, that the doctrine should be adopted in this circuit. *FDIC v. Texarkana Nat'l Bank*, No. 88–2216 (unpublished opinion) (June 2, 1989), *holding withdrawn on reh'g*, 874 F.2d 264 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). *Texas American Bancshares* is now pending on appeal and the applicability of *First Empire* may be decided before the present case reaches the juncture where this court must decide the question.

## VI

In counts XI and XII of their original complaint, plaintiffs seek to hold the FDIC responsible for NCNB's failure to continue funding the Delaware Bank and for breach of duty concerning the sale of the Delaware Bridge Bank's assets. As to count XI, the court holds that 12 U.S.C. § 1821(i)(3)(B) did not create a duty on the part of NCNB or the FDIC to continue funding the Delaware Bank. The FDIC was authorized by 12 U.S.C. § 1821(i)(1)(B) (Supp.1988) to determine which liabilities NCNB agreed to assume in the purchase and assumption transactions. NCNB did not agree to assume the funding practice, nor is there any basis to subject the FDIC to damages for failing to provide for the assumption of this practice. Regarding count XII, the court similarly finds no basis for imposing damages upon the FDIC because the FDIC and NCNB failed to enter into a non-solicitation agreement. Counts XI and XII are accordingly dismissed.

## VII

In counts V and VI of their original complaint, plaintiffs challenge the purchase and assumption agreements on grounds that they could permit FDIC–Corporate to commingle the liabilities of the failed banks in determining FDIC–Corporate's reimbursement obligations. The FDIC seeks dismissal of these claims on the ground that no commingling is intended, or permitted, under the purchase and assumption agreements. In response, plaintiffs assert they "will seek a stipulation from the FDIC that the assets and liabilities of the failed banks will not be commingled for reimbursement purposes." Ps.Br.Opp.Mot.Dis. at 71. Plaintiffs aver they will dismiss counts V and VI if such a stipulation is given or will move for declaratory relief if no agreement is forthcoming. Plaintiffs have done neither.

Because it appears a ruling relevant to counts V and VI may be unnecessary, the court will defer consideration of these issues until informed that a court decision remains necessary. If no notification is received, the court will deem counts V and VI abandoned.

## VIII

The remaining challenge to plaintiffs' complaint centers on the effect of the May 1988 letter ruling issued by the IRS. Count XIV of the complaint seeks to estop the FDIC from disavowing NCNB's representation in its request for a letter ruling that "all liabilities" were to be assumed by NCNB. Plaintiffs allege that, because all liabilities were not transferred in the Agreement, those liabilities must have been discharged and contend the FDIC is judicially estopped to deny the forgiveness of the $1 billion loan.

The court rejects plaintiffs' contentions. The letter ruling was requested in regard to a "proposed transaction" solely for tax purposes and does not affect in any way the FDIC's and NCNB's rights under the Agreement. That NCNB represented to the IRS it was assuming all liabilities, and

---

**27.** Chief Judge Sanders recognized in *Texas American Bancshares* that, because "the NBA contemplated only liquidations, the Court's task is to determine the underlying rule laid forth in the Act, and then apply it to the modern-day [purchase and assumption] transaction." 740 F.Supp. at 1249.

later did not do so, presents no basis for a finding of judicial estoppel. Count XIV is accordingly dismissed.

The motion to dismiss is granted in part and denied in part.

SO ORDERED.